**Brian WILBURN d/b/a Brian Wilburn & Associates, Plaintiff,**

v.

**JACK CARTWRIGHT, INC., Defendant.**

No. 79–C–338.

United States District Court, E. D. Wisconsin.

May 18, 1981.

Albert C. Elser, II, John A. Meyer, Prieve, Gerlach & Meyer, Milwaukee, Wis., for plaintiff.

David J. Cannon, Charles P. Graupner, Michael, Best & Friedrich, Milwaukee, Wis., and Kenneth R. Keller, Tuggle, Duggins, Meschan, Thornton & Elrod, Greensboro, N. C., for defendant.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

A trial to the court was held in this action on February 18 and 19, 1981. The parties have submitted post-trial briefs. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## I. BACKGROUND

The plaintiff, Brian Wilburn, is a Wisconsin resident who acts as a manufacturer's representative. He specializes in the marketing and sales of higher quality upholstered furniture for sale to commercial buyers, i. e., architects, interior designers, job specifiers, and commercial furniture retailers. He currently represents four manufacturers, including the defendant, Jack Cartwright, Inc. He has represented various other companies in the past.

In late 1975, Mr. Wilburn met with the defendant's president, Jack Cartwright, at a

Chicago furniture show. They orally agreed that Mr. Wilburn would be the defendant's representative in the states of Wisconsin, Minnesota, North Dakota, South Dakota, and Iowa. In January, 1976, the defendant added Nebraska to the plaintiff's territory. The oral agreement was never reduced to a written contract.

As a manufacturer's representative for the defendant, the plaintiff traveled to various potential purchasers of the defendant's furniture line. He would promote the defendant's products with those customers that he felt had a need for them. He was aided in this task by various sales literature of the defendant. All the furniture sold was custom-made for each order. The most significant variable was the fabric used to upholster the item. The defendant maintained several hundred fabric types, and the plaintiff had an elaborate fabric swatch book that he showed to customers.

The defendant's catalogs used by the plaintiff contained prices, but these were substantially inflated; the plaintiff had complete authority to apply specified discount plans according to his assessment of the situation. He usually used one discount plan or another.

Once the sale was made, the customer sent the order to the defendant. The plaintiff testified that he frequently helped customers fill out the order forms, although in his estimation this was not a difficult task. The actual item was usually shipped directly to the customer; however, on occasion, an item was shipped to the plaintiff first.

The plaintiff performed several other functions. He trained customer personnel in the preparation of the defendant's orders and in more general sales functions. When doing the latter training, he made an effort to highlight the defendant's product line. On occasion, customers would request faster delivery, and the plaintiff would arrange this with the defendant. Once the piece was delivered, he would follow-up with the customer to see if everything was satisfactory.

Customers usually came to the plaintiff first with complaints. He generally examined the piece in question and made a formal request for repair to the defendant. Accompanying the formal request was the plaintiff's own assessment of the problem. Local repairs were often the agreed-upon solution, and Mr. Wilburn would arrange these.

The plaintiff attended several trade shows each year to promote the defendant's furniture line. In addition to promotion, he would make contacts among buyers and attempt to solve any problems that came up. On a couple of occasions, the plaintiff advertised the defendant's products in his territory; the defendant did no advertising of its own in the territory.

The plaintiff was generally concerned with the financial condition of his customers, not only for the defendant's benefit, but also his own, since he believed that a sale to a poor credit risk did not reflect well on him. He testified that he performed informal, but exhaustive, credit checks on his customers by asking questions of other customers, representatives and others in a position to know the financial condition of a customer. When he was dealing with a new account, he asked the customer to send the first order to him, and he prepared a memorandum for the defendant detailing the plaintiff's knowledge of the new account.

Mr. Wilburn was paid a commission on each sale; the commission level fluctuated, but it was generally around eight percent. The plaintiff was responsible for all of his expenses. In the first year of his representation of the defendant, Mr. Wilburn spent considerable time cutting back the customer list with the defendant's approval, because his predecessor had contacted too many customers who were not good sales targets for the defendant. In 1976 and 1977, the plaintiff accounted for approximately four percent of the defendant's total national sales. In 1978, this figure rose to five percent.

In November, 1978, Donal Mulligan, the defendant's sales manager, came to Wisconsin for the purpose of visiting several customers with the plaintiff. Mr. Mulligan

and Mr. Wilburn spent all of one day visiting customers and dined together that evening. The next morning Mr. Mulligan summoned Mr. Wilburn to his hotel room. Mr. Mulligan briefly informed Mr. Wilburn that Cartwright, Inc. was not satisfied with his performance; the defendant was especially displeased that Mr. Wilburn did not operate a showroom in the Minneapolis area. The plaintiff said if that was what was desired he would do so, but Mr. Mulligan responded that Mr. Wilburn should have known to do so and that the defendant was terminating him immediately. It is not disputed that the defendant did not provide Mr. Wilburn with ninety days notice of termination, nor did the defendant give the plaintiff the opportunity to rectify any performance deficiencies. The plaintiff's subsequent efforts to persuade Mr. Cartwright that the defendant was making a mistake were to no avail.

The plaintiff's territory was divided among three firms, two of which had previous associations with Mr. Mulligan. Certain adjustments were made to give the plaintiff commissions on sales he had developed. Unsatisfied, the plaintiff commenced this action in state court, alleging violations of Wisconsin's Fair Dealership Law, Wis. Stat. § 135.01 *et seq.* The action was removed to this court in May, 1979. In a decision dated November 9, 1979, I ordered the defendant to restore the plaintiff to his position as a manufacturer's representative and enjoined the defendant from terminating the plaintiff from his position during the pendency of this action without first meeting the requirements of the Fair Dealership Law, Wilburn v. Jack Cartwright, Inc., No. 79–C–338 (E.D.Wis., filed November 11, 1979) (*Wilburn I*). The plaintiff has been employed as the defendant's manufacturer's representative since that time.

## II. APPLICATION OF THE FAIR DEALERSHIP LAW

### A. Choice of Laws

■ The defendant has renewed its argument that Wisconsin law should not apply to this case. I first addressed this issue in the November, 1979, decision, where I held that Wisconsin has the most significant contacts with this case, and, therefore, its laws should apply. This decision was affirmed by the court of appeals for this circuit in an unpublished order. *Wilburn v. Jack Cartwright, Inc.*, 631 F.2d 735 (7th Cir., 1980) (per curiam) (*Wilburn II*).

The defendant argues that the evidence presented at trial demonstrates that the earlier decision was incorrect. It contends that the court of appeals emphasized the place of performance of the contract in its analysis and as part of this stressed that the plaintiff's office was in Wisconsin. The defendant points out that the testimony was that the plaintiff's office was a spare room in his home and that he spent little time at his office. In 1978, the plaintiff also maintained a second office in Iowa, where his wife lived. The defendant further argues that the testimony was that the plaintiff spent twenty-five percent of his time in Minnesota and less in Wisconsin and that a substantial portion of his business was generated in Minnesota. Thus the defendant argues that Minnesota law should apply.

I have considered the evidence alluded to by the defendant, and I am satisfied that it does not undermine my earlier conclusion as upheld by the court of appeals. The plaintiff testified that he used his Wisconsin office as his base of operations. The Wisconsin office was equipped with a full array of the usual office equipment and was devoted completely to business. The plaintiff's files were located there and on occasion he would entertain customers at his adjoining home. It is neither surprising nor significant that the plaintiff was frequently absent from his office, given the nature of his employment.

The evidence regarding the volume of the Minnesota sales was in the record considered by the court of appeals. The parties contracted that the plaintiff would be the defendant's representative of a multistate area. The defendant has presented nothing in the contractual relationship that establishes its claim that Minnesota was to

be the situs of the contract; the higher sales do not in and of themselves accomplish this. As the court of appeals stated:

"Thus, when the most significant relationship test speaks, for example, of the place of performance of the contract, it does so with reference to the place of performance anticipated by the parties to the contract and reflected in the contract terms. Thus to the extent that the contract of the parties in this case did not contemplate a higher level of sales in one particular state, plaintiff is correct that the sales ultimately achieved under the contract is not the determinative consideration for place of performance." *Wilburn II, supra,* slip op. at 4–5.

The court then determined that the place of performance was a multi-state area and concluded that the state with the most significant contacts was Wisconsin and that therefore Wisconsin law should apply. This conclusion has not been disturbed by the evidence presented at the trial, and therefore I conclude that Wisconsin law does apply. *See P.S. & E., Inc. v. Selastomer Detroit, Inc.,* 470 F.2d 125 (7th Cir. 1972).

**B. Application of the Fair Dealership Law**

The defendant urges that I reconsider my decision in *Wilburn I* that a manufacturer's representative such as the plaintiff is covered by the Fair Dealership Law. The defendant argues that I should apply the holding of *E.A. Dickinson & Assoc. v. Simpson Electric Co.,* 509 F.Supp. 1241, (E.D.Wis., 1981), a case in which Chief Judge John W. Reynolds held that the Fair Dealership Law does not apply to manufacturer's representatives. The defendant also cites for support the case of *Foerster, Inc. v. Atlas Metal Parts Co.,* No. 40217 (Circuit Court for Waukesha County, Wisconsin, filed May 8, 1980).

In a case based on diversity jurisdiction, this court should decide the case in the same manner as would a state court. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). I believe that the Fair Dealership Law is applicable to this case and that this interpretation will be the one ultimately adopted by the Wisconsin courts.

The Fair Dealership Law is a remedial statute designed "to promote the compelling interest of the public in fair business relations between dealers and grantors," Wis.Stat. § 135.025(2)(a), and to protect dealers against "unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships," Wis.Stat. § 135.025(2)(b). It is to be "liberally construed and applied to promote its underlying remedial purposes and policies." Wis. Stat. § 135.025(1).

The statute defines a "dealership" as:

"[A] contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise." Wis.Stat. § 135.02(2).

A "dealer" is defined as: "[A] person who is a grantee of a dealership." Wis.Stat. § 135.02(5).

The existence of an agreement is undisputed in the case at bar. In my earlier decision, I found "that the plaintiff was granted the right to use the defendant's trademark and other commercial symbols; the plaintiff therefore satisfies the second element of the statutory definition." *Wilburn I, supra,* slip op. at 6–7. I further found that a community of interest existed between the parties.

Nothing in the trial record warrants my altering those findings. The plaintiff was permitted by the defendant to use the defendant's catalogs, which prominently display the defendant's logo, to solicit sales for the defendant. With the defendant's consent, the plaintiff placed stickers on the catalogs that listed the plaintiff's name, business address, and telephone number;

the plaintiff distributed these catalogs to his customers. The catalogs also listed the plaintiff as the sales representative for the territory. Within that territory, the plaintiff was in effect Jack Cartwright, Inc. The customers the plaintiff contacted rarely, if ever, saw any other representative of the defendant; customers conducted most of their business with the defendant through the plaintiff. I am satisfied that the plaintiff was authorized to use the defendant's tradenames, trademarks, and commercial symbols within the meaning of the Fair Dealership Law. I also persist in finding a community of interest between the plaintiff and the defendant.

I also find the defendant's argument regarding sales to be a strained reading of the statute's language. It is not disputed that the actual orders were sent to the defendant. However, those orders were developed as a direct result of the plaintiff's efforts. Mr. Wilburn visited the customer, discussed the customer's needs, worked out the custom features of the order, and established the price to be charged through the use of the various discount plans he was authorized to use. He also frequently prepared the order forms the customer sent to the defendant.

■ The defendant maintains that the plaintiff's function "is to introduce his product lines to dealers and specifiers." However, the defendant only pays the plaintiff for actual sales; this seems an odd way to compensate a person whose only function is to "introduce" the product line. I am satisfied that the plaintiff does more than "promote" the defendant's products; the plaintiff does indeed "sell" the defendant's products within the meaning of the Fair Dealership Law. *See Summit Corp. v. Cleveland Cutter and Reamers, Inc.*, No. 78–B1–0479 (Circuit Court for Ozaukee County, Wisconsin, filed October 5, 1979); *Al Bishop Agency, Inc. v. Lithonia*, 474 F.Supp. 828, 832 (E.D.Wis.1979).

■ I reject the defendant's contentions that Brian Wilburn is not a dealer because he (1) does not take title to the defendant's goods, (2) does not maintain an inventory,

and (3) he represents more than one manufacturer. I find nothing in the statute that defines a dealer as one who owns goods or maintains an inventory of goods. Similarly, there is nothing in the statute that even remotely suggests that a dealer who represents more than one grantor's line is excluded from coverage.

■ The purpose of the Fair Dealership Law is to give dealers protection from unfair treatment by their grantors. The statute prevents a grantor from seeking out a Wisconsin dealer, having the latter expend considerable effort building up the grantor's product line, and then having the grantor eliminate the dealer, leaving the benefit of the built-up product line to the grantor. The statute instead requires the grantor to adhere to certain minimum standards of conduct. I believe that a fair reading of the statute requires a finding that the plaintiff is covered by its terms.

### III.  LIABILITY

■ It is very clear that the defendant did not comply with the provisions of the Fair Dealership Law. Cartwright, Inc. did not provide the plaintiff with ninety days written notice of his termination, as required by section 135.04, Wis.Stat. The defendant also did not inform Mr. Wilburn of all the reasons for his termination and did not provide the plaintiff with "60 days in which to rectify any claimed deficiency." Wis.Stat., § 135.04.

Further, the defendant did not carry its burden to demonstrate that the termination of the plaintiff was for "good cause." Wis. Stat. § 135.03. The defendant did attempt to show that the plaintiff was not performing up to the defendant's expectations. However, the plaintiff testified that he was never informed of any dissatisfaction with his performance. The defendant's argument on this subject is belied by exhibit 21, a letter from Mr. Mulligan, the defendant's sales manager, to the plaintiff showing his sales performance for the first six months of 1978. This exhibit shows that the plaintiff had a 201 percent increase in shipments

over his 1977 figure and a 67 percent increase in bookings for the same period. The letter bears Donal Mulligan's handwritten note:

"*Brian*

Great Growth!!

Don"

I find that the evidence shows that the plaintiff provided competent representation for the defendant, that good cause for the termination was not established, and that the defendant did violate the Fair Dealership Law.

## IV. REMEDIES

As stated above, and pursuant to the court's earlier ruling, the plaintiff is currently representing the defendant in the territory. The plaintiff argues that this relationship is not a sufficient final remedy, because the testimony at trial indicated that the defendant is not happy with this arrangement and will terminate the plaintiff at the earliest opportunity. The plaintiff contends that this could result in further litigation, requiring the court to engage in further "supervision" of the relationship. The plaintiff argues that this unsatisfactory result should be avoided, and that the court should not require the relationship to continue. Instead, the plaintiff argues that the relationship should end and that he should be awarded damages in the amount of the profits he would earn if he were employed by the defendant until retirement. The plaintiff presented an expert witness who testified that an award based on the present value of these profits would total $213,750.

In *Esch v. Yazoo Manufacturing Co.*, 510 F.Supp. 53 (E.D.Wis., 1981), Judge Robert W. Warren upheld a jury verdict which included a substantial award for the profits the plaintiffs would have received if the relationship had continued until their retirement. The defendant argued that the plaintiffs should have been required to accept their offer of reinstatement as mitigation of damages, but Judge Warren found that the evidence supported the jury's determination that reinstatement was too

risky a proposition to require the plaintiffs to accept. *Esch, supra,* at 56; *see Sprecher v. Weston's Bar, Inc.,* 78 Wis.2d 26, 253 N.W.2d 493 (1977). Implicit in Judge Warren's ruling is the proposition that an award for future lost profits is an acceptable remedy under the Fair Dealership Law if continuation of the relationship is doomed to failure.

This is not the situation in the case at bar. I do not accept the contention that the defendant's witnesses demonstrated their unwillingness to work with the plaintiff within the confines of the statute and that therefore the relationship should be ended. The plaintiff is in effect asking for a windfall, a damage award based on substantial profits without any of the labor accompanying those profits. The Fair Dealership Law does not require such an award every time its provisions are violated. A wronged dealer should recover an award of future lost profits only in the most egregious case, and the case at bar is not such a case.

The defendant does have the duty to comply with the terms of the Fair Dealership Law. Such compliance can reasonably be assured by making the terms of the preliminary injunction permanent. Thus the defendant must comply with the terms of the injunction or risk a finding of contempt. This will adequately protect the plaintiff but does not impose a substantial damage award on the defendant or unfairly restrict the defendant's ability to operate its business.

As a result of the defendant's improper termination of the plaintiff, the plaintiff suffered a loss of commissions for much of 1979. The plaintiff's expert testified that the plaintiff's net commission income from the defendant for all of 1979 would have been approximately $14,250. I am mindful of the conflicting evidence on this subject, but I am persuaded that the plaintiff's calculations are supported by a preponderance of the evidence. I also find that the plaintiff did all that was required to mitigate these damages. The plaintiff did receive

$3500 in commissions for a small portion of 1979. Subtracting that figure from the estimated income of $14,250 leaves a figure of $10,650 as the plaintiff's damages from the termination.

In addition, under section 135.06, Wis. Stats., the plaintiff may recover "reasonable actual attorney fees." The plaintiff's counsel has submitted no proof on this subject. Accordingly, I will set up the following schedule for review of a fee award: The plaintiff's counsel will serve and file within ten days of the date of this order an affidavit or other proof detailing their claim for reasonable actual fees in this case. The defendant may serve and file any comment it wishes to make within five days thereafter. *See Esch, supra.*

### CONCLUSION

Therefore, IT IS ORDERED that the defendant be and hereby is permanently enjoined from terminating the plaintiff without first complying with the requirements of sections 135.03 and 135.04, Wis.Stats.

IT IS ALSO ORDERED that judgment be entered in favor of the plaintiff against the defendant for the sum of $10,650.

IT IS FURTHER ORDERED that counsel serve and file their affidavits or other proof regarding their claim for reasonable attorney fees in accordance with the above stated schedule.