**Brian WILBURN, d/b/a Brian Wilburn & Associates, Plaintiff-Appellee,**

v.

**JACK CARTWRIGHT, INC., Defendant-Appellant.**

No. 82–2028.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1983.

Decided Oct. 18, 1983.

David J. Cannon, Michael, Best & Friedrich, Milwaukee, Wis., for defendant-appellant.

John A. Meyer, Prieve, Meyer & Elser, Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, WOOD and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

In this diversity action, defendant-appellant, Jack Cartwright, Inc. ("JCI"), appeals the decision of the trial court holding that the plaintiff-appellee, Brian Wilburn, was a dealer within the sense of the Wisconsin Fair Dealership Law ("WFDL"), Wis.Stat. §§ 135.01 *et seq. Wilburn v. Jack Cartwright, Inc.,* 543 F.Supp. 174 (E.D.Wis.1982) (*"Wilburn II"*). The case was on remand to the district court for consideration in light of a recent Wisconsin Supreme Court decision, *Foerster, Inc. v. Atlas Metal Parts*

*Co.,* 105 Wis.2d 17, 313 N.W.2d 60 (1981), interpreting the applicability of the WFDL to a manufacturer's representative. *Wilburn v. Jack Cartwright, Inc.,* 676 F.2d 698 (7th Cir.1982) (unpublished order).

This appeal raises a single issue: whether the district court erred in applying the WFDL to this fact situation. In spite of the consideration given to this case by the distinguished trial judge and his reasoned view of the particular circumstances we come to a different conclusion in this case which involves a developing area of Wisconsin law. As we conclude that Wilburn is not a dealer within the scope of the WFDL and, therefore, not within its protective provisions, we reverse and remand with instructions to the district court to enter judgment for Jack Cartwright, Inc.

## I.

Wilburn, a Wisconsin resident, is a manufacturer's representative. He promotes the sale of upholstered furniture to commercial buyers such as architects, interior designers, job specifiers, and commercial furniture retailers. At the relevant time, Wilburn represented four manufacturers, including JCI.

In late 1975, Wilburn met with JCI's president, Jack Cartwright, at a Chicago trade show. They orally agreed that Wilburn would be JCI's exclusive representative in the states of Wisconsin, Minnesota, North Dakota, South Dakota, and Iowa. In January 1976, Nebraska was added to Wilburn's territory.

As a manufacturer's representative for JCI, Wilburn traveled throughout his territory promoting JCI's products and soliciting sales orders. Wilburn affixed his name and address sticker to the JCI catalogs he left with potential customers. All the furniture sold was custom-assembled for each order.

The JCI catalogs Wilburn used contained a substantially inflated price list. Wilburn had authority to apply òne of the three specified discount plans according to his assessment of the situation. If Wilburn could "set up" a customer on a lesser discount plan, he would increase his commission on the sale. Additionally, JCI's catalog and price list were independently mailed to approximately fifteen thousand businesses nationwide.

The order forms used in the sales were drafted by JCI. Wilburn had no authority to accept orders; rather, the customer sent the order to JCI for acceptance. Wilburn testified that he often helped the customer fill out the order forms, although he considered this an easy task. Usually, the item was shipped directly to the customer and Wilburn had nothing to do with the delivery of the product.

Wilburn also performed various customer service functions. He trained customers' sales personnel in the preparation of JCI's order forms and in general sales functions. Occasionally, Wilburn would help expedite delivery of an order upon a customer's request. After delivery, Wilburn would contact the customer to assure satisfaction. Wilburn generally arranged any necessary repair work after receiving authorization from JCI.

Wilburn paid no franchise fee, incurred no capital expense in undertaking to represent JCI, maintained no showroom, and had no office outside of his home. At times, Wilburn kept one or two sample items in his home; however, he did not sell from inventory. As JCI's representative, Wilburn was not required to advertise their product line. However, on his own initiative, Wilburn ran one advertisement of all the lines he represented, including JCI, in a regional trade journal. To protect his time investment and his reputation, Wilburn also performed some informal credit checks on his customers. Rather than exhaustive inquiries, these checks entailed questioning other customers, manufacturers' representatives, and others in a position to know the financial condition of a potential customer. Wilburn testified that the information gathered was readily available in the industry. Wilburn was not required to extend credit or to assume the risk of late payment or nonpayment by JCI's customers. He did not bill customers or participate in collections.

Wilburn was paid a commission on each sale which varied but was generally around eight percent. All expenses incurred in the promotion of JCI's products were borne by him. Wilburn's income from the JCI line was approximately nineteen percent of his total income. A chronology of the facts leading to Wilburn's termination and culminating in this action is recited in the district court opinion. *Wilburn v. Jack Cartwright, Inc.*, 514 F.Supp. 493, 495–96 (E.D.Wis.1981) (*"Wilburn I"*).

## II.

Section 135.02(5) Wis.Stat. defines a "dealer" to whom the protections of the WFDL are available as "a person who is a grantee of a dealership situated in this state." A "dealership" is defined in section 135.02(2) as follows:

"Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wilburn contends that he was granted the right to sell JCI's goods and to use JCI's trademark and other commercial symbols within the meaning of the WFDL. The district court agreed that the relationship existing between Wilburn and JCI was a dealership under the WFDL and, therefore, Wilburn was entitled to the protective provisions of the WFDL. *Wilburn I,* 514 F.Supp. at 497–98.

While that decision was on appeal to this court, *Wilburn v. Jack Cartwright, Inc.,* No. 81–1972 (7th Cir. Jan. 13, 1982), the Wisconsin Supreme Court rendered its decision in *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 313 N.W.2d 60 (1981), construing for the first time the scope of the WFDL as applied to a manufacturer's representative. On remand from this court for considera-

tion in light of *Foerster,* the district court reaffirmed its earlier decision, finding the instant case to be distinguishable from *Foerster. Wilburn II,* 543 F.Supp. 174.

Foerster was a Wisconsin sales corporation acting as manufacturer's representative for Atlas Metal Parts Company ("Atlas"). Atlas and Foerster had a sales agreement whereby Foerster would promote the sale of Atlas's products in exchange for a commission on resulting sales; however, Foerster lacked authority to transfer Atlas products or to commit Atlas to a sale. Foerster was also responsible for servicing a customer after delivery. Atlas furnished Foerster with Atlas's advertising brochures, business calling cards, and models of its products. In undertaking the representation agreement, Foerster expended no money for advertising Atlas's products, maintained no supply or inventory of Atlas's products, paid no fee to Atlas, and made no investment in Atlas. During this time, Foerster also acted as a manufacturer's representative for at least four other companies. Foerster used a different calling card for each company it represented, in addition to a card which identified "Foerster, Inc." solely as a manufacturer's representative.

Based on these facts, the Wisconsin Supreme Court held that Foerster was not entitled to the protections of the WFDL as a "dealer" because it was granted neither the right to sell Atlas's products nor the right to use the tradename, trademark, or symbol of Atlas as provided in section 135.02(2) nor the type of interest which the WFDL was designed to protect. *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 31, 313 N.W.2d 60, 66–67 (1981).

Initially, the *Foerster* court determined that, in light of the legislative history of the WFDL, Foerster's interest did not come within the protection of the WFDL. The court noted that the legislative aim was to protect the interests of a dealer whose "economic livelihood may be imperiled by the dealership grantor," 313 N.W.2d at 62, such as where termination would bring about the type of " 'economic hardship' which arises where 50% to 60% of the business' time is

dedicated to the sale of one company's line of products," or where "the entire business is built around and relies on the sale, servicing or representation of one grantor's products, such as gasoline service stations and fast food franchises," *id.* at 65. According to the *Foerster* court, the legislative history showed that the term "dealership" described businesses similar in nature to franchises—those where the "dealer" makes a substantial financial investment in terms of inventory, physical facilities, or good will. 313 N.W.2d at 64. The court concluded that the WFDL was not intended to protect a manufacturer's representative such as Foerster who had not devoted a substantial portion of his business to the promotion of Atlas's products thereby causing its economic livelihood to be dependent solely on the relationship.

In light of the legislative history, the *Foerster* court then interpreted two of the indicia of a dealer set forth in section 135.-02(2): "sell," and "use a trade name." The *Foerster* court concluded that Foerster was not granted the right to sell Atlas's products, rejecting the notion that promoting the sale of products was equivalent to selling. *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 29, 313 N.W.2d 60, 64. Rather, the court indicated that the right to sell generally "consists of an unqualified authorization to transfer the product at the point and moment of the agreement to sell" or authority to commit the grantor to a sale. *Id.* at 26, 313 N.W.2d at 64.

The *Foerster* court finally considered whether Foerster was granted the right to use Atlas's tradename, trademark, or other commercial symbol as those terms are used in section 135.02(2). *Id.* at 29, 313 N.W.2d at 66. Atlas provided Foerster with business calling cards and Atlas advertising brochures. There was no other indication that Atlas ever authorized the use of the Atlas trademark or logo by Foerster or that Foerster ever expended any of its own funds in advertising Atlas's products. The *Foerster* court noted that "this extremely limited use of the Atlas name and trademark differs considerably from the use made of the grantor's trademark in the typical 'dealer-

ship' intended by the legislation." In a franchise situation, "the dealer uses the trademark to imply that his establishment furnishes the type of quality service associated with the grantor." *Id.* at 29–30, 313 N.W.2d at 66. In contrast, Foerster used the Atlas logo on business cards only as a means to inform potential customers of his status without any indication as to the nature of the relationship. The court concluded that "there must be more than the mere use of a calling card identifying a manufacturer's representative as an agent for a company before such representatives are 'dealerships.'" *Id.* at 31, 313 N.W.2d at 67.

Based upon *Foerster,* we conclude that Wilburn was not a WFDL "dealer" because he did not sell JCI products, did not possess the right to use the JCI trademark, and did not own the type of interest covered by the WFDL. Wilburn had neither "unqualified authorization to transfer the product at the point and moment of the agreement to sell" nor authority to commit JCI to a sale as required by *Foerster.* Under *Foerster,* it is not sufficient that Wilburn "did everything to sell the defendant's products but give final approval of the order." *Wilburn II,* 543 F.Supp. at 177. Where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the WFDL; however, where a sales representative merely solicits orders that are subject to the manufacturer's approval, no such investment has occurred.

As in *Foerster,* Wilburn's extremely limited use of the JCI name and logo differs considerably from the use made of the grantor's trademark in the typical WFDL "dealership." *Foerster,* 105 Wis.2d at 29, 313 N.W.2d at 66. There is no significant difference between the use of calling cards and brochures in *Foerster* and the use of stickers on catalogs here. Unlike a typical franchise, Wilburn did not "prominently" display the JCI trademark to identify his business as one furnishing the quality service associated with the grantor. Rather, Wilburn's business is associated with several companies.

Wilburn's association with JCI differs from the common conception of "franchise" or "dealership" in that Wilburn represented three manufacturers in addition to JCI and maintained only an office in his home. Although Wilburn spent much of his time promoting JCI, his termination as JCI's representative did not gravely imperil his economic livelihood or cause the type of "economic hardship which arises where 50% to 60% of the business is dedicated to the sale of one company's product line." *Id.* at 27, 313 N.W.2d at 65.

The statute is directed to a franchise situation. We will not give the "dealership" language the expansive construction Wilburn urges. Wilburn does not come within the definition of "dealership" as interpreted by the *Foerster* court.

In dicta, the *Foerster* court, without approving *Wilburn I,* drew the following factual distinctions with *Wilburn I:* (1) Wilburn made credit checks; (2) Wilburn bore advertising expenses; and (3) Wilburn made price adjustments. The Wisconsin Supreme Court, however, did not have the benefit of the record in this case and, despite the distinctions drawn, did not indicate that it would reach the same decision as *Wilburn I.* The transcript reveals that the informal credit checks were not exhaustive inquiries, but instead, information readily available in the industry. Wilburn conducted these checks to protect his time investment and his reputation rather than as a requirement of his agreement with JCI. Moreover, Wilburn acknowledged that accounts which he had considered financially acceptable were, at times, rejected by JCI's financial personnel.

As JCI's representative, Wilburn was not required to advertise its product line. However, on his own initiative, Wilburn ran one advertisement in a regional trade journal of all the lines he represented, including JCI. Wilburn admitted that the advertisement "didn't seem to do any good" and that JCI had explicitly decided not to advertise in the particular journal, a decision which Wilburn considered prudent from JCI's standpoint. The distinction between running one multi-line, ineffective advertisement in a regional trade journal and never advertising as in *Foerster* is insignificant.

Rather than having authority to freely adjust prices, Wilburn was simply authorized to apply one of three specified discount plans to JCI's price list. This authority enabled Wilburn to increase his sales potential. The particular discount affected Wilburn's commission, not the amount realized by JCI.

Reversed and remanded for further proceedings consistent with this opinion.