AIDA ENGINEERING, INC., Plaintiff,

v.

RED STAG, INC., Defendant.

Civ. A. No. 85–C–210.

United States District Court,
E.D. Wisconsin.

March 7, 1986.

---

Howard A. Pollack, Charne, Glassner, Tehan, Clancy & Taitelman, Milwaukee, Wis., Gerald L. Morel, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, Ill., for plaintiff.

Richard J. Carlson and John G. Wylie, Patterson, Jensen, Wylie, Silton & Seifert, S.C., Appleton, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This diversity action for declaratory judgment is brought pursuant to 28 U.S.C. sec. 2201 to determine whether the defendant is a "dealer" in the plaintiff's products within the meaning of the Wisconsin Fair Dealership Law ("WFDL"), Wis.Stats. ch. 135, and whether the plaintiff may terminate its relationship with the defendant without first complying with the WFDL.

The plaintiff Aida Engineering, Inc., ("Aida") is an Indiana corporation whose business is importing and selling Aida-brand stamping presses and related accessories ("Aida products"). The defendant Red Stag, Inc., ("Red Stag") is a Wisconsin corporation whose business is consulting

and acting as a sales representative for the plaintiff Aida and for other manufacturers and importers of metal fabricating and stamping equipment.

Red Stag has counterclaimed for damages sustained as a result of "this action, and all other activity of the plaintiff consistent with the termination of defendant as a dealer ... done with intent to harm the defendant, with malice ... and in bad faith." (Defendant's answer and counterclaim, filed February 27, 1985.) The plaintiff Aida moved to dismiss Red Stag's counterclaim and for summary judgment on its claim for declaratory relief on July 16, 1985. On August 1, 1985, the defendant filed both a cross-motion for summary judgment on the plaintiff's claim for declaratory relief and a motion to amend its counterclaim to plead tortious interference with its contractual rights. In conjunction with this clarification of its counterclaim, the defendant sought to join two Aida officers as "third-party defendants." On September 27, 1985, oral argument was heard on plaintiff's motion to dismiss the counterclaim and on the cross-motions for summary judgment.

### FACTUAL BACKGROUND

Beginning in approximately September 1981 and continuing to the present time, the defendant has acted as a sales representative for the plaintiff in Wisconsin. The parties relationship has been governed by an oral agreement and by the provisions of a document entitled the "Dealer's Package," which Aida periodically revised and issued to all its dealers and sales representatives nationwide. The April 1984 version of this document consists of sixteen pages and contains primarily listings of Aida's product line together with suggested retail prices. The first three pages, however, deal with general ground rules established by Aida for all its "dealers." The portions of the "Dealer's Package" relevant to this case follow.

### DEALER'S PACKAGE

We at Aida Engineering want to thank all our dealers for their interest in selling and servicing Aida products. We are proud of the products which we sell, and we know that you share that pride.

In order to maintain a good working relationship with our dealers, Aida has established certain basic rules and policies. These rules and policies are designed to assist Aida in helping you.

PRICING: Each dealer is an independent businessman who has the responsibility to determine the price for his products. It is contrary to Aida policy to, in any way, interfere with that right. Suggested retail prices are furnished only for your consideration in arriving at your own pricing decisions. In some cases, you may act as a sales representative in finding and quoting customers to whom Aida will sell directly. On such sales you will receive a commission, and we will expect that you quote our suggested retail price. A price list is included in your dealer package and will be kept up to date so that you will know the price to be quoted on sales made directly by Aida to the customer.

.  .  .  .  .

DEALER DISCOUNT: If a dealer is buying from Aida for resale, the "net price" to dealer shall be dealer's cost and no further commission is to be paid to dealer. If a dealer is selling Aida-owned products, the discount (commission) to be paid is based upon the actual selling price in accordance with the following schedules. In this case the sale price shall not be less than the suggested price.

The defendant Red Stag acts only as a sales representative; that is, Red Stag never purchases Aida products for resale to customers, nor takes title to such products, nor itself pays Aida for any products ordered by customers. Instead, the plaintiff Aida sells directly to the customers Red Stag solicits. Red Stag is paid a commission on each sale. Prices are determined by Aida, though Red Stag may reduce a price by discounting part of its commission.

Red Stag provides Aida only preliminary credit information on potential customers and assumes none of the risk of nonpayment beyond, possibly, the loss of a commission.

Aida metal presses range in price from $35,000 to over $1,000,000. Relatively few "dealers" buy Aida products for resale to customers.

Red Stag has made no financial investment in Aida's Wisconsin business beyond the expenses incurred in acting as a sales representative. It keeps no inventory of Aida products, provides no showroom space for samples, has never paid any kind of franchise fee, and has spent less than $1,000 advertising Aida products over the four years it has represented Aida. Red Stag does not warrant Aida products nor is it responsible for servicing them, though as a practical matter, customers often call Red Stag first if there is a problem with an Aida product. Thus, apparently the extent of Red Stag's post-sale responsibilities is to screen complaints and put customers in touch with Aida's service department.

## I. CLAIM FOR DECLARATORY JUDGMENT

The WFDL defines a "dealer" as "a person who is a grantee of a dealership situated in this state." Wis.Stats. sec. 135.-02(2). "Dealership" is defined at Wis. Stats. sec. 135.02(3) as follows.

"Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Neither party to this case doubts the existence of an agreement between Aida and Red Stag. Therefore, if Red Stag has the right, pursuant to its agreement with Aida, either to "sell or distribute" Aida

products or to "use a trade name, trademark, service mark, logotype, advertising or other commercial symbol" belonging to Aida, and there is "a community of interest" between Aida and Red Stag, then Red Stag is a "dealer" in Aida products for WFDL purposes. Red Stag has not resisted Aida's contention that it has not granted Red Stag the right to use any Aida commercial symbol. The issue, therefore, is whether Aida has granted Red Stag the right to sell or distribute Aida products in such a way as to create a community of interest between Aida and Red Stag.

Red Stag makes two arguments that it should be considered a dealer for WFDL purposes. Red Stag first argues that courts interpreting Wis.Stats. sec. 135.02(3) have not ruled out the possibility that a manufacturer's representative can be so involved in essential aspects of selling some types of goods and services as to have the kind of investment in the manufacturer's business that the WFDL should be construed to protect. Red Stag's second argument is based on the evidence of the agreement it has with Aida. The "Dealer's Package" quoted above should be construed, according to Red Stag, to grant Red Stag the right to sell Aida products.

### A. Judicial Construction of the WFDL Definition of a Dealer

Red Stag's construction of Wis.Stats. sec. 135.02(3) is supported by a single decision which can no longer be regarded as sound. In *Al Bishop Agency, Inc. v. Lithonia-Division of Nat'l Service Indus., Inc.*, 474 F.Supp. 828, 832 (E.D.Wis.1979), a manufacturer's representative was found to be a "dealer" for WFDL purposes because the representative solicited sales on a one-to-one basis, performed customer service functions and held himself out publicly as an agent for the manufacturer.

The Wisconsin Supreme Court, however, has since held in *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 420 (1981), that the WFDL's definition of "dealership" does not include a manufacturer's representative who lacked

the right to sell or distribute the manufacturer's products. The party seeking to qualify as a WFDL "dealer" in *Foerster* represented at least four other companies. He was paid on a commission basis by the defendant manufacturer for sales he solicited, and neither took possession nor distributed the products sold. He paid no franchise fee nor did he make a substantial investment in the defendant in undertaking the representation. Once the representative found a potential customer, the manufacturer took full control of the transaction, negotiating and finally approving the terms of a sale, making credit arrangements, and assuming credit risks and the responsibility for all collections. The representative did have some follow-up servicing responsibilities.

The Wisconsin Supreme Court held that such a representative was not a "dealer" within the meaning of the WFDL. The Court reasoned that the statute was intended to protect only persons like franchisees who "make a substantial financial investment in inventory, physical facilities or 'good will' as part of their association with the grantor of the dealership." *Foerster*, 105 Wis.2d at 24, 313 N.W.2d 420.

The United States Court of Appeals for the Seventh Circuit followed *Foerster*'s construction of the WFDL in *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262 (1983). There the plaintiff Wilburn, a representative of a custom-made, commercial furniture manufacturer, incurred no capital expense or franchise fee in undertaking the representation. He had no showroom and kept no inventory other than some samples. Like the plaintiff in *Foerster*, his chief task was to solicit orders for the defendant manufacturer who retained ultimate authority to accept or reject such orders. To solicit orders Wilburn attended trade shows, called on potential customers, distributed the defendant's literature, and on at least one occasion advertised in a regional trade journal. He received a commission on accepted orders. Although he could not set the price for defendant's goods, he had discretion to select price quotations from three specified discount plans; he could

receive the maximum commission on the sale if he "set up" a customer at the lowest discount. The plaintiff also performed informal credit checks on customers but did not invoice them and assumed none of the risk of nonpayment. Finished furniture was usually shipped directly to the customer. Wilburn had responsibility as a practical matter for some aftersales service. Of the four manufacturers Wilburn represented, sales of the defendant's furniture accounted for some nineteen percent of his business at the time of termination.

The court of appeals had little trouble concluding that Wilburn was not a "dealer" within the meaning of the WFDL, since he did not have unqualified authority either to commit the manufacturer to a sale or to transfer the product to the customer at the point and time of sale.

> Under *Foerster*, it is not sufficient that Wilburn "did everything to sell the defendant's products but give final approval of the order." (citation omitted) Where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the WFDL; however, where a sales representative merely solicits orders that are subject to the manufacturer's approval, no such investment has occurred.

*Wilburn*, 719 F.2d at 265.

Although it is undisputed that Red Stag has invested neither in inventory nor showroom space for Aida products and that it has paid no franchise fee, Red Stag contends that it has, nevertheless, invested substantial assets in representing Aida. The WFDL, Red Stag asserts, should be construed to protect such investment. Red Stag argues further that it has relied on the continuance of its relationship with Aida no less than other dealers the WFDL was designed to protect.

It is true that Red Stag has worked for some years to establish good will and a market for Aida products in Wisconsin. Furthermore, Aida is the only manufacturer of products of their kind for whom Red Stag solicits sales. The other manufactur-

ers Red Stag represents sell primarily accessories to products like those sold by Aida. Therefore, even though Aida commissions comprise only some ten percent of Red Stag's revenues, the termination of Red Stag's relationship with Aida could cause Red Stag's business to collapse.

The WFDL, however, was not designed to protect every business relationship essential to the financial survival of one or more of the parties involved. The statute's protection is restricted to those businesses which have made a substantial capital investment in selling or offering for sale the products of the dealership grantor. Investments in inventory or real estate are protected because, as a general rule, they are made only in reliance on the continuation of the dealer-manufacturer relationship. Such investments often cannot be liquidated except on terms which are unfair to dealers and which sometimes unjustly enrich dealership grantors. Similarly, a heavy "front-end" dealer investment in advertising might qualify for WFDL protection because the dealer might otherwise be unjustly deprived of a return on that investment if the venture is successful. The WFDL protects dealers who risk their investments along with the manufacturers. Beyond this it is difficult to envisage what forms of investment will produce the kind of "community of interest" which the WFDL regulates. The forms of franchising are constantly evolving. The WFDL's definition of "dealership" is flexible enough to include new forms of dealership investment, which the WFDL protects from appropriation by the dealership grantor prior to maturity.

While it may not, therefore, be possible to produce a definitive list of the kinds of investment that are protected by the WFDL, neither good will, produced merely by the duration of a representative's relationship with customers, nor reliance, in the form of a sales strategy to represent certain manufacturers and not others, qualify by themselves. *See E.A. Dickinson & Associates v. Simpson Electric Company*, 509 F.Supp. 1241, 1242–44, 1246 (E.D.Wis. 1981); *but see* Note, *The Wisconsin Su-preme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law*, 1985 Wis.L.Rev. 155.

### B. Construction of the Terms of Aida's Agreement with Red Stag

Red Stag next argues that language in the "Dealer's Package" gives Red Stag the right to sell Aida products. Red Stag admits it never exercised such a right, but claims that the mere formal possession of the right would put Red Stag in the class of "dealers" protected by the WFDL. However, there is no need to decide whether that unexercised right alone would make Red Stag a "dealer" for WFDL purposes, because I find that Aida has not granted Red Stag the right to sell Aida's products.

The fact that the "Dealer's Package" uses the word "dealer" indiscriminately to describe both persons who sell Aida products from inventory and those who, like Red Stag, only solicit sales on a commission basis is of little help. This document was drafted for Aida representatives nationwide in conformity with the apparently loose usage of the term "dealer" in the capital goods trade. The class of persons the WFDL was meant to protect is not to be defined by the accidents of informal business terminology..

The "Dealer's Package" addresses itself to a collective "you" which includes each and every of Aida's twenty or more American representatives. All that the language quoted above reveals is that some or all of Aida's representatives "in some cases" solicit customers on a commission basis, that when they do so they must use Aida's suggested price, but that they may charge any price they wish on sales from their own inventory of Aida products. There is nothing here to compel the inference that all representatives solicit sales sometimes for Aida and sometimes on their own behalf. Nor is there any language affirmatively granting any representative the right to buy Aida products for inventory.

■ Nothing either in controlling case law or in the provisions of the agreement between these parties indicates that Red Stag has such right to sell or distribute Aida products as would produce a community of interest between Aida and Red Stag. Red Stag is not, therefore, a dealer for WFDL purposes.

## II. MOTION TO AMEND THE COUNTERCLAIM

Red Stag proposes in a motion filed in this court on August 1, 1985, to amend its counterclaim by joining as "third-party defendants" two Aida officers, who Red Stag claims have instigated this lawsuit and otherwise acted to terminate Red Stag's representation of Aida out of personal animosity toward an officer of Red Stag.

■ Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading at a time subsequent to the service of a responsive pleading by the Court's leave which shall be freely given when justice requires. Leave to amend may not be denied merely because the proposed amendment introduces a new cause of action or defense. *See* 3 *Moore's Federal Practice* para. 15.08[2]. Where, however, the Court finds undue delay by the moving party, undue prejudice to the party opposing amendment, or that the amendment would be futile, it may in its discretion deny the motion to amend. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

### A. *Amended Counterclaim Not Futile*

Aida first argues that Red Stag's motion to amend should be denied because the proposed amended counterclaim is futile. "[W]here the proposed amendment fails to allege facts which would support a valid theory of liability ... or where the party moving to amend has not shown that the proposed amendment has substantial merit" it is appropriate to deny the amendment as futile. *Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir.1979). Aida argues that the facts alleged by Red Stag do not support a claim for tortious interference with contractual rights.

The facts alleged by Red Stag are as follows. Aida has reduced contacts between the two companies, hindering Red Stag's ability to solicit sales, and has entered into an apparently prospective agreement with another company to represent Aida in Red Stag's territory in the event Red Stag is terminated. Aida no doubt is preparing to terminate Red Stag. Such preparation, Red Stag contends, gives the impression to potential Aida customers that Red Stag is a "lame duck," making such customers reluctant to deal with Red Stag. Whereas, Red Stag officers claim, no customer ever refused to transact business through Red Stag during the first four years of its representation of Aida, since Aida began to prepare to terminate Red Stag two customers in Red Stag's territory have expressed their unwillingness to deal with Red Stag. Thus, Aida has compromised Red Stag's contractual right to exclusive representation.

Red Stag further alleges that Aida's top executive officers, Kimikazu Aida and Ken Mitani, have conspired to cause Aida to prepare Red Stag's termination and have done so against Aida's interests out of personal animosity toward Paul Pfundtner, a Red Stag officer.

Red Stag's allegations support a claim for breach of contract against Aida and claims for tortious interference with contractual relations against Aida officers, Kimikazu Aida and Ken Mitani. *See* Prosser and Keeton, *Torts*, secs. 129 (5th ed. 1984). However, since Kimikazu Aida and Ken Mitani are not parties "who [are] or may be liable to [Red Stag] for all or part of the [Aida's] claim against" Red Stag, they cannot be joined, pursuant to Fed.R.Civ.P. 14(a), as "third-party defendants." Mr. Aida and Mr. Mitani are, however, the only parties against whom Red Stag has a claim for tortious interference. Red Stag may join them, therefore, as necessary parties since "in [their] absence complete relief cannot be accorded among those already parties." Fed.R.Civ.P. 19(a)(1).

**1128**

In summary, Red Stag has alleged facts sufficient to support a claim for breach of contract against Aida and a claim for tortious interference with contractual rights against Mr. Aida and Mr. Mitani, who may be joined as necessary parties for the purpose of according complete relief. Thus, the amendment may not be denied as futile.

### B. *Undue Prejudice May Be Avoided*

Aida next argues that it will be unduly prejudiced if Red Stag is allowed to amend its counterclaim at this late date.

An important factor in determining whether to deny a motion to amend because of undue prejudice is whether the prejudice can be eliminated by conditions attached to the granting of the motion. *Armstrong Cork Co. v. Patterson-Sargent Co.*, 10 F.R.D. 534 (N.D.Oh.1950); 3 *Moore's Federal Practice* para. 15.08[6]. Since the Court grants Aida's motion for summary judgment on its declaratory claim, Aida's interest in terminating Red Stag free of the constraints imposed by the WFDL cannot be prejudiced. Granting Red Stag's motion to amend would prejudice Aida, however, insofar as insufficient time remains for Aida to prepare to defend the new breach of contract claim. Moreover, as Mr. Aida and Mr. Mitani have not been parties to this case until now, they must be served and afforded time to answer Red Stag's claim. Absent sufficient time to prepare their defense against the tortious interference claim, they will be severely prejudiced. Such prejudice can be eliminated by extending discovery and rescheduling trial dates. The Court, therefore, will grant Red Stag's motion to amend its counterclaim so as to plead claims for breach of contract and tortious interference but the Court will cancel the remaining scheduled trial date. Following service of process on the new parties and the filing of their answers, a conference will be set to reschedule necessary discovery and new trial dates.

### ORDER

IT IS THEREFORE ORDERED that Aida's motions for summary judgment on its claim for declaratory relief that Red Stag is not a "dealer" within the meaning of the WFDL is granted and Red Stag's motion for summary judgment on Aida's declaratory claim is denied.

IT IS FURTHER ORDERED that Red Stag's motion for leave to amend its counterclaim so as to state a claim for breach of contract against Aida and for tortious interference with contractual rights against Kimikazu Aida and Ken Mitani is granted.

IT IS FURTHER ORDERED that Kimikazu Aida and Ken Mitani may be joined as necessary parties.

IT IS FURTHER ORDERED that the existing trial schedule is cancelled and that a scheduling conference to set an additional discovery period and new trial dates will be held after the additional parties have been served and their answers have been filed.