Richard E. **MOORE**, Plaintiff-Appellant,

v.

**TANDY CORPORATION,**
**Defendant-Appellee.**

No. 86–2313.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 27, 1987.
Decided May 18, 1987.

Stephen P. Hurley, Aagaard, Hurley, Burish & Milliken, Madison, Wis., for plaintiff-appellant.

Thomas Pyper, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant-appellee.

Before POSNER, FLAUM, and MANION, Circuit Judges.

POSNER, Circuit Judge.

The appeal in this diversity case requires us to decide whether the plaintiff, although nominally an employee of the defendant, was a "dealer" within the meaning of the Wisconsin Fair Dealership Law, Wis.Stat. §§ 135.01 et seq., in which event he could be terminated only for "good cause." Wis. Stat. § 135.03; see Remus v. Amoco Oil Co., 794 F.2d 1238, 1240 (7th Cir.1986).

Shortly before the law was passed in 1973, Radio Shack (Tandy Corporation), a nationwide retail distributor of consumer electronic goods, abandoned its system of franchised outlets and replaced them with stores it owned itself, managed by employees. It offered the store managers a "special manager incentive agreement." Radio Shack would pick the site for a store, lease the store premises from the owner, equip the store, select and supply the inventory, establish pricing directives, pay all the store's expenses (though the variable expenses would be subtracted from the manager's compensation, as we shall see), maintain all financial records, employ all store personnel, and determine store hours, while the special manager would train and supervise the sales staff, maintain daily sales and inventory records, set prices (in accordance, however, with Radio Shack's directives), and authorize returns, exchanges, and repairs of goods. The special manager would not receive a fixed wage, but instead one half of the store's revenues (after adjustments unnecessary to dwell on here), minus the store's variable expenses. (This is the same arrangement as in a standard sharecropping contract, with the manager corresponding to the sharecropper and Radio Shack to the owner of the sharecropped land.) If the variable expenses exceeded the manager's share of the store's monthly revenues, the difference would be subtracted from the manager's compensation in subsequent months, but he would never have to dig into his own pocket to make good any loss resulting from the operation of the store. For tax purposes the parties designated the compensation received by the manager as employee income, and the agreement is emphatic that the manager is an "employee" —though of course these labels are not decisive. The term of the agreement is two years, and the agreement expires automatically when the term is up, unless renewed.

We do not understand Moore to be arguing that if this were all there was to the special manager incentive program he would be a dealer under the Wisconsin Fair Dealership Law. The critical wrinkle is the requirement that the special manager put up a security deposit equal to half the value of the store's inventory. The deposit is retained by Radio Shack and earns no interest for the special manager; but if and when the agreement is terminated, Radio Shack must return the deposit to him. Consistent with the concept of a security deposit, Radio Shack may debit the special manager's deposit to cover losses caused by his dishonesty, breach of contract, gross mismanagement, or failure to manage the store with "a reasonable degree of care, skill, and judgment."

Moore signed his first special manager incentive agreement in 1973. Ten years later, after several renewals, he was terminated because Radio Shack was disappointed by his sales performance. Moore's initial security deposit had been $15,000, but as his inventory grew, so did his deposit, and by the time he was terminated it was a shade over $70,000. Radio Shack had never debited the deposit, and it returned it to him in full. Radio Shack does not contend that it had "cause" within the meaning of the Wisconsin Fair Dealership Law to terminate Moore, while Moore on his part does not contend that the termination violated the agreement. Hence it is critical to decide whether the relationship

described above made him a dealer within the meaning of the Fair Dealership Law.

Anyone who has a contractual "right to sell or distribute goods or services" is a dealer, provided "there is a community of interest in the business of ... selling or distributing goods or services." Wis.Stat. §§ 135.02(2), (3). The term "community of interest" is defined as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). Were it not for the security deposit, Moore would not have had the requisite community of interest with Radio Shack, because he would have had no investment (other than of his human capital) in the common enterprise—the sale at retail of goods distributed by Radio Shack. To be a "dealer," you must have made a financial investment in the "dealership." See, e.g., *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 24–25, 313 N.W.2d 60, 63–64 (1981); *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 767–71, 300 N.W.2d 63, 72–73 (1981); *Bush v. National School Studios, Inc.*, 131 Wis.2d 435, 440–41, 389 N.W.2d 49, 52 (App.1986); *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262 (7th Cir.1983). Moore argues that the security deposit is all the financial stake he needs. The district judge, who granted summary judgment for Radio Shack, 631 F.Supp. 1037 (W.D.Wis. 1986), disagreed, reasoning that because Radio Shack's obligation to return the security deposit was conditioned only on Moore's refraining from injuring Radio Shack by negligence or worse, Moore bore no investment risk.

The language of the statute is not illuminating; and to observe that the statute's purpose is to help dealers at the expense of their suppliers is as unhelpful as it is obvious. The question is whether Moore was a dealer, and always the question about a "remedial" statute is, *how much* help was it intended to give the benefited group? But we can get some aid in our interpretive task merely by asking why the statute protects dealers but not employees. The cynical answer (which may not be untrue on that account) is that dealers but not employees have the political muscle to obtain protectionist legislation of this type, which is to say legislation designed to give a class of persons more than they could get from arm's-length bargaining in a free market. A related, less cynical, but incomplete answer is that a person who makes an ill-liquid investment in a joint enterprise may unknowingly be placing himself at the mercy of his joint venturer. Suppose that, as is common in franchise arrangements, Moore had been authorized or required to invest his own money in modifying the store premises to Radio Shack's specifications, and had done so; and suppose that the premises would not be suitable for any other use without additional modifications that would be expensive. Then Moore would be at Radio Shack's mercy, for if Radio Shack terminated the franchise Moore would lose the investment he had made in modifying the premises to Radio Shack's specifications. This would be a concrete example of "taking unfair advantage of the relative economic weakness of the franchisee." *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 677 (2d Cir.1985). Moore could protect himself in advance against such opportunistic behavior on Radio Shack's part by negotiating for a long-term dealership contract; in effect (and this is the irreducibly protectionist aspect of the statute) the Wisconsin Fair Dealership Law forces on the parties the equivalent of such a contract, in the form of a nonwaivable prohibition against the franchisor's terminating the dealership without cause.

On this interpretation of the statutory design, the investment that turns an employee into a dealer by creating a community of interest between him and his supplier must be the kind of investment that involves a risk of, or temptation to, opportunistic behavior by the supplier. That element is missing here. Unless Radio Shack violated the conditions on debiting Moore's security deposit there was no way it could deprive Moore of the "investment" represented by that deposit. He could get the deposit back at the end of each two-year term of the special manager incentive

agreement, simply by declining to renew the agreement. He could if he wanted terminate the agreement before the end of the term, simply by giving written notice, for the contract provides that "either party shall have the right to immediately terminate this Agreement by giving the other party written notice of its election to terminate." Finally, it would be returned to him automatically if and when Radio Shack refused to renew, as eventually happened. It was not money sunk in fixtures or inventory or counters or decor; it was money on deposit—effectively, on demand deposit. And every cent was in fact returned to Moore when Radio Shack terminated him.

As Moore emphasizes, that security deposit was not, like a bank deposit insured by the federal government, a riskless deposit. If Radio Shack had gone broke before Moore was terminated, he would have been just another unsecured creditor and might have lost most or even all of his security deposit. It may also be true that the security deposit is larger than actually necessary to cover reasonably anticipated losses during the short term of the special management incentive agreement, and that Radio Shack was using these security deposits to finance its growth. If so, Moore was an investor in the same sense in which a bank that lends money to an entrepreneur is an investor—indeed, in somewhat the same sense as a stockholder is an investor, because the "interest" that Moore received was a function of the success of the store he managed. The deposit carried no explicit interest, but in that respect, too, it was like common stock. It enabled Moore, in contrast to Radio Shack's regular store managers, to obtain an entrepreneurial return. But really it was a *sui generis* "investment," since, unlike a bond, as we have said, it paid no interest, while unlike common stock it was redeemable on demand and at a fixed price.

■■ Nevertheless, mindful that in a close case our policy is to defer to the district judge's interpretation of the law of the state in which the judge sits, see, e.g., *City of Clinton v. Moffitt,* 812 F.2d 341, 342 (7th Cir.1987), we uphold Judge Crabb's conclusion that Moore was an employee rather than a dealer. Unlike an equity investor, Moore could recapture his investment (initially only $15,000) whenever he wanted, simply by giving written notice that he was terminating the special manager incentive agreement. More important, Moore did not make the *kind* of investment that dealers customarily make and that places the dealer in the supplier's power and thereby provides the principal rationale for the Wisconsin statute. It was not an investment sunk in specialized resources (such as a store's interior) which would be worth less in another use. "Such investments," we read in an opinion that is very much in the spirit of our analysis, "often cannot be liquidated except on terms which are unfair to dealers and which sometimes unjustly enrich dealership grantors. Similarly, a heavy 'front-end' dealer investment in advertising might qualify for WFDL [Wisconsin Fair Dealership Law] protection because the dealer might otherwise be unjustly deprived of a return on that investment if the venture is successful. The [Wisconsin law] protects dealers who risk their investments along with the manufacturers." *Aida Engineering, Inc. v. Red Stag, Inc.,* 629 F.Supp. 1121, 1126 (E.D. Wis.1986). The common law doctrine of "equitable recoupment" has been used to give dealers whose dealerships are terminable at will similar protection against opportunistic terminations by their suppliers. See Faruki, *The Defense of Terminated Dealer Litigation: A Survey of Legal and Strategic Considerations,* 46 Ohio St.L.J. 925, 930 (1985).

But Moore's was an investment whose value was fixed, protected, and recoverable with only modest delay. It was not an investment in advertising materials that would become worthless if he ceased to sell the advertiser's goods. His investment was not at risk (except in the sense that Tandy, like any other firm, might go broke). Far from locking Moore into a perhaps unwanted embrace with his supplier, the requirement of a substantial security deposit made it easier for Moore to find alternative employment; it was a form of forced saving for him, which would ensure

that he had a nest egg with which to start over if he lost his job, or at least the wherewithal to repay any business loans he may have taken out in connection with his managership. If the exaction of the security deposit made it easier for Radio Shack to expand—if "security deposit" was to that extent a misnomer—still that fact alone cannot condemn an arrangement that does not have the usual elements of a dealership.

We do not want to be misunderstood as saying that Moore incurred no loss by being terminated. He may have developed skills specialized to operating a Radio Shack store and therefore worth less in any alternative employment. And to the extent that his efforts created goodwill for Radio Shack, Radio Shack may have been appropriating the fruits of his efforts by terminating him and merely returning his deposit. But these things would be as true if he had been a salaried manager or a sales representative on commission. The concern of the Wisconsin Fair Dealership Law is with the person who makes a financial investment that may become unrecoverable if he is terminated by his supplier; and Moore was not such a person.

We have treated this case as one of first principles because we can find no cases in Wisconsin or elsewhere that consider whether the requirement of a security deposit can make a nominal employee an actual dealer. However, although previous decisions have not used the concept of "opportunistic behavior" that we have found helpful in framing our analysis (unless *Aida Engineering* was alluding to it in the passage we quoted), the relevant judicial pronouncements are consistent with our approach. For example, Justice Coffey, as he then was, described the purpose of the Fair Dealership Law as follows in an opinion for the Wisconsin Supreme Court:

> [T]he law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or "good will".... It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice.

*Foerster, Inc. v. Atlas Metal Parts Co., supra,* 105 Wis.2d at 24, 313 N.W.2d at 63. Compare *Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.,* 761 F.2d 345, 349 (7th Cir.1985). The economic livelihood of such businessmen would be imperiled because the termination might wipe out their investment (if it was an investment specialized to the franchise). Moore's "investment" (if that is what the security deposit was) was not wiped out; it was returned to him intact. His livelihood was not imperiled by his having been required to make the deposit. If ours is a narrow reading, which confines the Wisconsin statute to situations where the signing of the "dealership" agreement places the dealer in a vulnerable position because he is required to make an investment that may be wiped out if the agreement is terminated, still this reading is in the spirit of *Foerster,* and we must take our cue on matters of Wisconsin state law from the Wisconsin Supreme Court.

AFFIRMED.