Robert F. **KORNACKI**, d/b/a Robert Kornacki & Associates, Plaintiff–Appellant,

v.

**NORTON PERFORMANCE PLASTICS,** Defendant–Appellee.

No. 91–1651.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1991.

Decided Feb. 3, 1992.

Joseph J. Welcenbach (argued), Welcenbach & Widmann, Richard W. Double, Double & Double, Milwaukee, Wis., for plaintiff-appellant.

Brian W. McGrath (argued), Jon P. Christiansen, Foley & Lardner, Milwaukee, Wis., for defendant-appellee.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WILL, Senior District Judge.[1]

1. The Honorable Hubert L. Will, Senior Judge of the United States District Court for the North-

BAUER, Chief Judge.

In this appeal, we must decide whether a manufacturer's sales representative qualifies as a dealer under the Wisconsin Fair Dealership Law, Wisc.Stat. § 135.02 (1989–90). On a motion for summary judgment, the district court held that the representative was not a dealer. We affirm.

On December 1, 1985, Robert Kornacki and Norton Performance Plastics ("Norton"), a manufacturer of industrial plastic products, signed a sales agreement. Under the agreement, Kornacki became Norton's exclusive selling agent in Minnesota and Wisconsin. In September 1988, Norton notified Kornacki that he was terminated as of November 10, 1988. Kornacki sued Norton in the Circuit Court of Milwaukee County. He claimed his termination violated the Wisconsin Fair Dealership Law, Wisc.Stat. § 135.02 (1989–90) ("WFDL"), and that he was entitled to unpaid commissions.

Norton removed the action to the United States District Court for the Eastern District of Wisconsin based upon diversity of citizenship, and moved for summary judgment. Norton contended Kornacki is a manufacturer's representative, not a dealer, and therefore, is not protected by the WFDL. Kornacki also moved for summary judgment; he argued that he is a dealer because he had the right to sell Norton's products and to use its trademark and logo.

■ We review a district court's grant of summary judgment *de novo* to determine whether the record as a whole establishes that the moving party was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See, e.g., Santella v. Chicago*, 936 F.2d 328, 331 (7th Cir.1991); *First Wisconsin Trust Co. v. Schroud*, 916 F.2d 394, 398 (7th Cir.1990). We believe that Norton has shown an absence of issues of material fact, and is entitled to judgment as a matter of law.

The WFDL is designed to promote the public interest in fair business relations

ern District of Illinois, Eastern Division, is sitting by designation.

between dealers and grantors. A grantor is a "person who grants a dealership"; a dealer is a "grantee of a dealership." Wisc.Stat. § 135.02(2). A dealership is a

> contract or agreement ... between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name or trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, by retail, by lease, agreement or otherwise.

Wisc.Stat. § 135.02(3). To promote the public interest, the statute protects dealers against unfair treatment by economically superior grantors. Wisc.Stat. § 135.025.

Because Kornacki had no right to sell Norton's goods, the district court determined Kornacki was not a dealer.[2] *Kornacki v. Norton Performance Plastics*, No. 89–C–738, slip op. at 5 (E.D.Wis. Feb. 27, 1991). Thus, it held, the WFDL does not apply to the parties' contract. On appeal, Kornacki renews his argument that, because he could bind the company to a sale, he was indeed a dealer. In the alternative, he argues that his right to use Norton's trademark also demonstrates his status as a dealer. We shall consider each argument in turn.

█ Kornacki bases his first argument on his own affidavit and the deposition testimony of Norton's National Accounts Manager, Harold Pelzer. In his affidavit, Kornacki maintained that he "had absolute authority to bind Halogen/Norton to sales." Appellant's Supplemental Appendix (S.App.) at 64. The right to sell "consists of an unqualified authorization to transfer the product at the point and moment of the agreement to sell" or the authority to commit the grantor to a sale. *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 26, 313 N.W.2d 60, 64 (1981). Kornacki equates the right to bind Norton to a sale with a right to sell. Even if we

agreed with Kornacki, that fact alone, as the district court properly noted, may not be dispositive. *Kornacki*, No. 89–C–738, slip op. at 5. Further, the evidence just does not support Kornacki's contention that he had the authority to bind Norton. Kornacki's affidavit provides no support for his claim, other than his own adamant assertions.

He claims that Pelzer's deposition testimony confirms his authority to bind Norton. During the deposition, Pelzer said:

Q. Okay. And now, on that particular instance where you would ship goods out based on [the customer's] verbal purchase order [phoned in by Kornacki], would it be fair to state that Mr. Kornacki had the authorization, as your exclusive selling agent, to bind the company to make this sale to the customer?

A. No, by contract he's not—he can't do that.

Q. But if Mr. Kornacki would give you a verbal purchase order, you would recognize that it would be binding on the company?

A. Yes.

Q. So he tells a customer, "Hey, XYZ Company, I'll phone in a verbal purchase order; and the guys in Chicago here at Halogen [Norton] will send it up." You recognize that would be binding between Halogen and the customer?

A. Yes.

Q. Okay. And that procedure we just went over would not be an entirely unusual thing in the business?

A. Very unusual.

Q. Well—

A. With all our salesmen, I would say probably if you saw one or two of these a year, that they go directly to the salesman and give them a purchase order, it's very rare. All of our—99.9 [percent] of our sales come through the mail.

---

**2.** The district court did not address Kornacki's claim that he was a dealer because he had the right to use Norton's trademark.

Appellant's Appendix (App.) at 7. We agree with the district court that this testimony read in context does not support Kornacki's position.

Further, the parties' contract contradicts Kornacki's claim. "The Sales representative shall have no authority to commit the Company in any matter, cause, or thing whatever, without the prior written consent of the Company either hereunder or otherwise, or to use the Company's name in any way not specifically authorized by this agreement." December 1, 1985 Agreement ("Agreement"), ¶ 13(a). This provision is underscored by other contractual language. *See, e.g.*, ¶ 10(b) (The Sales Representative in no case is authorized to bind the Company ...); ¶ 11(b) (The Company reserves the right to refuse any business originating in the Territory ...).

■ Despite this clear language, Kornacki maintains that he had the right to sell Norton's products. Although it is possible that parties' course of performance may modify a written contract, a party asserting such a modification must provide some evidence of the modification. *See, e.g.*, *S & M Rotogravure Serv. Inc. v. Baer*, 77 Wis.2d 454, 252 N.W.2d 913 (1977); *Air Power Equip. Corp. v. Telemark Co.*, 34 Wis.2d 699, 150 N.W.2d 457 (1967). Here, the only evidence Kornacki provides is his own self-serving affidavit and his strained reading of Pelzer's deposition testimony. We do not find this evidence sufficient to establish that the written contract was modified by the parties' subsequent performance.

Other factors courts have considered to determine whether a sales representative is a dealer weigh against Kornacki's WFDL claim. In *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 24, 313 N.W.2d 60, 63 (1981), the Wisconsin Supreme Court explained that the statute was intended to protect only businesses like franchisees, who "make a substantial financial investment in inventory, physical facilities or 'good will' as part of their association with the grantor of the dealership...." *Foerster*, 313 N.W.2d at 63. Before the relationship was terminated, Foerster, Inc. sold metal stampings for a manufacturer, Atlas Metal Parts Company (Atlas) for several years. Foerster represented other companies, was paid on commission by Atlas, and paid no franchise fee. It made no substantial investment with Atlas and did not take possession of or distribute the goods it sold. Foerster was not required to maintain inventory or advertise Atlas products. Atlas took full control of the sale once a potential customer was located. Atlas accepted, rejected, or approved orders, it made credit arrangements and assumed all credit risks and the responsibility for collections. 313 N.W.2d at 62. Foerster did have some follow up responsibilities. *Id.* Nevertheless, the parties' written contract did not give Foerster the right to sell Atlas's goods. Based on these factors, the Wisconsin Court determined that Foerster was not a dealer within the meaning of the WFDL.

In *Foerster*, the Court contrasted selling agents' rights to those of franchisees, such as service stations and fast food restaurants. These businesses are authorized to transfer the product at the moment of agreement. *Id.* at 64. The WFDL was designed to protect businesses with these kinds of rights. The Court also noted that the percentage of a business's earnings affected by the relationship is a significant factor in the analysis. The WFDL protects "dealerships" in which the entire business is built around one "grantor's" products. Foerster represented four other manufacturers. Therefore, the Court found that Atlas's termination of the contract did not cause the kind of economic hardship the WFDL attempts to prevent.

We followed *Foerster* in *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262 (7th Cir. 1983). The plaintiff in *Wilburn* distributed the defendant, Jack Cartwright International's (JCI), catalogs (to which he had affixed his name and address) to potential customers. The catalogs contained a price list, but Wilburn could modify the catalog prices based on one of three discount plans. The deeper the discount, the lower Wilburn's commission. Customers completed order forms (sometimes with Wilburn's as-

sistance) and mailed them to JCI for acceptance. JCI shipped the products directly to customers. *Id.* at 263. JCI also handled all billing and collections. Although he did not assume any credit or late payment risk, Wilburn performed informal credit checks. He also expedited rush orders and contacted customers as to whether they were satisfied with their orders. Wilburn did not pay a franchise fee, maintain a showroom or office outside his home, or incur any capital expenses related to his work for JCI. He received a commission for each sale, and paid all the expenses he incurred in promoting the defendant's products. *Id.* at 264. Wilburn worked for three other manufacturers; JCI's line represented about nineteen percent of his total income. *Id.* at 263–64.

In *Wilburn*, we determined that a "sales representative [who] merely solicits orders that are subject to the manufacturer's approval" is not a dealer under the WFDL. *Id.* at 265. *See also Aida Eng'g, Inc. v. Red Stag, Inc.*, 629 F.Supp. 1121 (D.Wis. 1986). We believe that Kornacki has failed to distinguish his relationship with Norton from those considered in *Foerster* and *Wilburn*. Not only are we unpersuaded by his affidavit and strained reading of Pelzer's testimony, but Kornacki's relationship with Norton has all the earmarks of the relationships found wanting in the controlling case law. The agreement between Kornacki and Norton calls Kornacki a "sales representative" (S.App. at 5). Kornacki did not pay a franchise fee or make any capital investment in Norton. He did not maintain an office or showroom outside his home. He was paid on commission for sales he solicited, but did not assume any credit risk or collection responsibilities. Kornacki could only vary prices by decreasing his commission. The vast majority of sales were carried out through orders sent through the mails and accepted by Norton. Although he occasionally made rush deliveries, Norton shipped most products directly to customers. Kornacki incurred some advertising expenses, however he was not required to do so—advertising was Norton's responsibility under the contract. Agreement at ¶ 14, S.App. at 12. *Compare*

*Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883 (Wis.1987) (photographer who solicited business, set prices, paid fifty percent of advertising costs, collected payments, and extended credit was dealer under WFDL).

Kornacki has spent a long time developing customers for Norton and its predecessor, Halogen Insulator & Seal Corporation—he began representing Halogen in 1955. This kind of good will, however, is not enough to make Kornacki a dealer under the WFDL. *Moore v. Tandy Corp.*, 819 F.2d 820, 822 (7th Cir.1987) ("To be a 'dealer' you must have made a financial investment in the 'dealership.' ") (collecting cases); *Bush v. National School Studios, Inc.*, 131 Wis.2d 435, 389 N.W.2d 49, 52 n. 4 (Wis.App.1986), *aff'd*, 139 Wis.2d 635, 407 N.W.2d 883 (Wis.1987); *Foerster*, 313 N.W.2d at 64 (WFDL assumes some kind of financial investment). Although sales of Norton's products are a significant portion of Kornacki's income (ranging from 75 to 85 percent, Appellant's Br. at 3–4), this factor alone is not dispositive. For example in *Aida Engineering, Inc. v. Red Stag, Inc.*, 629 F.Supp. 1121 (D.Wis.1986), the district court properly found that although the sales representative had spent some time developing good will and its business could collapse as a result of the manufacturer's termination of the contract, the sales representative was not a dealer under the statute.

> The WFDL ... was not designed to protect every business relationship essential to the financial survival of one or more of the parties involved. The statute's protection is restricted to those businesses which have made a substantial capital investment in selling or offering for sale the products of the dealership grantor.

*Id.* at 1126. Despite the volume of orders Kornacki solicited for Norton, he still has not established this relationship. Based on these considerations, we believe that Kornacki has failed to show he was authorized to sell Norton's products.

■ Kornacki also claims that he was a dealer because he was authorized to use Norton's trade name and logo. The statute

provides that a dealership is granted when a party is given the right to "use a trade name, trade mark, logotype, advertising...." Wisc.Stat. § 135.02(3). Kornacki again is faced with clear contractual language undermining his assertion. Paragraph 13(a) of the Agreement states, "The Sales Representative shall have no authority to ... use the Company's name in any way not specifically authorized by this agreement." S.App. at 11. Norton provided Kornacki with business cards and brochures that contained its trade name and logos. Kornacki distributed these to potential customers. Kornacki also placed an ad in the Yellow Pages for "Halogen Insulator & Seal Corp." Apparently Kornacki did not change his ad after Norton purchased Halogen. Some of Norton's sales literature continued to bear Halogen's name, although some did not. Kornacki had business cards with both names.

Under *Foerster*, this use of Norton's trade name and logos does not satisfy the requirements of the WFDL. In *Foerster*, Atlas provided Foerster with business calling cards and advertising brochures. 313 N.W.2d at 66. Atlas never authorized Foerster to use its trademark and Foerster never advertised Atlas's products. *Id.* The Court explained that the statute contemplates a use of a trademark in conjunction with the dealer's "implicit guarantee of a certain quality of product or service...." *Id.* In contrast, Foerster's cards and brochures were used only to inform potential customers of its status· as Atlas's representative. There was no indication of the parties' relationship or that Foerster would furnish the quality of service associated with Atlas. Based on these factors, the Court determined that Foerster had no right to use Atlas's trademark. There must be more, it held, than the mere use of a calling card identifying a manufacturer's representative to find that a representative is a dealer. *Id.* at 67.

In *Wilburn*, this court evaluated Wilburn's use of JCI's name and logo. Wilburn placed his own name and address sticker on the JCI catalogs he left with customers. 719 F.2d at 263. On his own initiative, Wilburn ran a single advertisement for all the product lines he carried. Based upon our reading of *Foerster*, we found that this extremely limited use of JCI's trademark and logo did not qualify Wilburn as a dealer. *Id.* at 265. Wilburn did not prominently display the JCI logo or identify himself as furnishing JCI-quality service. In order to satisfy the requirements of the WFDL, a dealer must prominently use and display the grantor's logo. For example, in *Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883 (D.Wis.1987), the dealer prepared solicitation materials, including calendars, pens, identification badges, stationary and other advertising. He also bore fifty percent of the advertising costs under the contract. *Id.* at 885. The Wisconsin Supreme Court found that these were the kinds of uses contemplated by the WFDL.

We believe Kornacki's use of Norton's trade name is analogous to Wilburn's and Foerster's use of manufacturers' trademarks. Norton furnished Kornacki with calling cards and brochures which bore Norton's trademark and logo. Kornacki did take out a Yellow Page ad from year to year, although the ad simply listed "Halogen Insulator & Seal" and a phone number.[3] S.App. at 87. The parties' contract explicitly prohibited Kornacki's unauthorized use of the company name. Agreement ¶ 13(a), S.App. at 11. Given this explicit language and Kornacki's restricted use of Kornacki's trademark, we refuse to find that he qualified as a dealer under the WFDL.

For the foregoing reasons, the judgment of the district court is

Affirmed.

---

**3.** We are assuming that Norton purchased the rights to Norton's trademark when it purchased the rest of its enterprise. We therefore do not distinguish between Kornacki's use of the Halogen and Norton trademarks.