JAMES TALCOTT, INC., Respondent, v. P & J CONTRACTING COMPANY, INC., Appellant.

*February 2—March 16, 1965.*

70

For the appellant there were briefs by *Grootemaat, Cook & Franke,* attorneys, and *John J. Ottusch* of counsel, all of Milwaukee, and oral argument by *Mr. Ottusch.*

For the respondent the cause was submitted on the brief of *Fritz & Zick* of Waukesha.

FAIRCHILD, J. The contract was one for the leasing of goods under which the lessee (P & J) agreed to pay $26,319.60 ($23,500 plus a finance fee) and the lessee had the option of becoming the owner upon full compliance with the terms of the contract.

P & J asserts that this is a conditional sale and subject to the requirements of ch. 122, Stats. Sec. 122.01 (1) provides in part:

"In this chapter 'conditional sale' means . . . any contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract."

Talcott does not challenge the proposition that if the contract is a conditional sale under ch. 122, Stats., Talcott will be unable to recover any deficiency. Since P & J had paid less than 50 percent of the purchase price, Talcott was not compelled by sec. 122.19 to resell under that section, but under sec. 122.20, Talcott had the option of reselling for the account of P & J upon compliance with sec. 122.19. Under secs. 122.23 and 122.24, P & J would be discharged of its obligation if there were no resale. Admittedly Talcott failed to comply with the requirements of sec. 122.19 with respect to

a resale. There was no public auction in Wisconsin; there was no sale within thirty days after the retaking, and notices were not given. A judgment for deficiency may be had only in the event of a valid resale.[1]

Talcott makes three arguments why the contract between Adams and P & J was not a conditional sale as defined in the portion of sec. 122.01 (1), Stats., above quoted: (1) The total payment P & J agreed to make, $26,319.60, was substantially in excess of the market value of the scrapers, asserted to be $18,000, and therefore not "substantially equivalent" thereto. (2) P & J, by defaulting in the required payments, forfeited its option, and when Talcott repossessed the scrapers, P & J no longer had "the option of becoming the owner." (3) The option and the rental agreement were separate and independent agreements, rather than a single "contract."

Talcott also asserts in its brief, though not in its affidavit opposing summary judgment, that it could prove on a trial that the lease form was used at the request of P & J, and appellant is accordingly estopped from claiming that what appears to be a lease was really a conditional sale.

We shall discuss these arguments in order.

1. *Assuming that the amount P & J agreed to pay under the lease, and upon payment of which it could take ownership, was substantially in excess of the market value of the scrapers, determined upon testimony at a trial, was such amount "substantially equivalent to the value of the goods," under sec. 122.01 (1), Stats.?*

Dean Bogert, the draftsman of the Uniform Conditional Sales Act, explained the background of the statutory definition as applied to the type of contract involved in this case, as follows:

---

[1] *Mack International Motor Truck Corp. v. Thelen Trucking Co.* (1931), 205 Wis. 434, 439, 237 N. W. 75.

"Leases. Frequently the transaction by which goods are delivered for use is called by the parties a 'lease' and provides for the payment of 'rent;' yet it may appear to have as its possible or probable purpose the passing of title to the goods. Whether this contract is to be treated as a conditional sale under the statutes, or is a true lease, is a problem which has given some trouble to the courts.

"The name by which the transaction is called is not of importance. . . .

"In still a third class of cases the arrangement is slightly different. The buyer is to have the option at the end of his rental payments, of becoming the owner of the leased goods. Here a sale will obviously result if all the rent is paid. No man is going to decline the option of becoming owner of the leased goods, when he can acquire them by the mere expression of his wish. Nothing is to be paid beyond the so-called rent. If the payment of the rent is to give the so-called lessee the option of becoming the owner of the goods, clearly the rent is the purchase price in disguise. The cases have treated this contract as a conditional sale. . . .

"Frequently these leasing contracts provide that the lessee is to have the option of becoming the owner of the leased goods at the completion of his rent payments, if he pays a nominal sum in addition, as, for example, $1 or $5. The courts have held that the rental payments constituted the real, substantial price in these cases and that the requirement of the payment of a trifling sum beyond the rent did not change the nature of the transaction and prevent it being considered a conditional sale. It was not in fact a true lease, with an option to buy for a sum which was equivalent to the then value of the goods. . . ." [2]

Professor Vold has commented upon the same area, as follows:

"The deal may therefore be expressed in the form of a lease of the goods for a periodic rent; this rent being equivalent to the purchase price paid in installments. The 'rent'

---

[2] 2A Uniform Laws Annotated, Bogert, Commentaries on Conditional Sales, pp. 21 and 23, sec. 13.

thus stipulated is made absolutely payable. The lessee is by the terms of the agreement to become the owner or has the option of becoming the owner upon full payment as agreed. The courts in such cases look through the form to the substance. Where this matter is for any reason material, they treat such deals as conditional sales. Leases may be made with options to purchase the goods for a merely nominal amount at the expiration of the stipulated rental period. The agreed rent here, too, is made absolutely payable and substantially equivalent to the purchase price. Such deals are similarly interpreted, it being equally clear that such deals are in substance conditional sales." [3]

The Commissioners' Note to sec. 1 of the Uniform Conditional Sales Act also makes it plain that the portion of the language here involved was intended to treat as conditional sales those contracts which appear to be leases, but under which ownership is certain or almost certain to pass to the lessee upon fulfilment of his obligations.

In the light of this background for the statutory language our conclusion is that the "value" referred to in the statute is the value fixed by the contract of the parties, *i.e.,* the amount or consideration upon payment of which the lessee shall, or may at his option, become the owner. Where the lessee binds himself to pay, ostensibly as rent, all or very nearly all of such amount or consideration, the statute treats the payments of rent as instalments of a purchase price and the contract as a conditional sale.

Under this view, it is irrelevant whether, by hindsight, it can be determined that the market value of the goods was more or less than the amount the lessee obligated himself to pay. Such determination would only establish whether the lessee had made a good or a bad bargain.

Although the Uniform Commercial Code is not yet in effect in this state, we note that in treating the problem now

---

[3] Vold, Law of Sales (hornbook series, 2d ed. 1959), pp. 326, 329, sec. 64, ch. 10.

before us, it does not speak in terms of "value," but provides as follows :

". . . an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." [4]

2. *In applying the definition in sec. 122.01 (1), Stats., is it material that, upon default in rental payments, lessee would lose its option to purchase?*

Under the terms of the contract, P & J had the option of becoming the owner upon full compliance with the terms of the contract. The contract did provide, however, that failure to make a rental payment within ten days of the time specified shall cause the option to expire. The contract nevertheless fulfils the statutory definition because P & J did have the option of becoming the owner upon full compliance with the terms. It is our opinion that this is controlling, even though the contract purported to provide for forfeiture of the option upon continued default. The contract was accordingly a conditional sale, and the rights of the lessee-buyer after continued default would be governed by ch. 122, Stats., even though some of the terms of the contract might appear to conflict with the statute.

3. *Were the option and rental agreement one contract?*

The "Rental Agreement" and "Privilege of Purchase Option" were signed the same day by H. J. Adams on behalf of Adams, and Patrick J. Murphy, Jr., on behalf of P & J. The "Privilege of Purchase Option" contains a reference to the "lease agreement . . . to which the purchase option is attached . . ." The pleadings and admissions in response to demand treat the two documents as one. There is nothing in

---

[4] Sec. 401.201 (37) (b), Stats. 1963, effective July 1, 1965.

the record to suggest that the two documents were not simultaneously executed as parts of a single transaction.

"The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument. . . ." [5]

Treated as one contract, the two instruments show that there was a conditional sale as defined in the statute.

4. *Estoppel.*

Talcott did not originally allege nor amend its complaint, after answer, to plead that P & J was estopped from claiming that the contract was a conditional sale.[6] The affidavits filed in opposition to the motion for summary judgment set forth no fact supporting the claim of estoppel. In order to prevent summary judgment on P & J's motion, sec. 270.635 (2), Stats., required that Talcott "by affidavit or other proof, show facts which the court shall deem sufficient to entitle him to a trial." The failure to do so is adequate reason for declining to consider the claim at this stage.

The claim, as stated in Talcott's brief, is that P & J chose to have the agreement in lease form for its sole benefit. Although we rest our decision upon the ground just stated, we note in passing that the statute defines a contract which on its face is a lease, with certain terms, as a conditional sale. Although it appears historically that it was ordinarily the seller who tried to disguise the transaction, it is doubtful if this is reason enough to permit the seller to prove that in a given instance it was the buyer who insisted on the disguise

[5] 17 Am. Jur. (2d), Contracts, p. 668, sec. 264. See *In re Crown Cartridge Corp.* (D. C. N. Y. 1962), 220 Fed. Supp. 914.

[6] *Schneck v. Mutual Service Casualty Ins. Co.* (1963), 18 Wis. (2d) 566, 573, 119 N. W. (2d) 342.

and thus to avoid recognition of the true character of the transaction.

*By the Court.*—Order reversed, cause remanded with directions to dismiss the complaint upon the merits.