Vincent J. O'LEARY, Plaintiff,

v.

STERLING EXTRUDER
CORPORATION,
Defendant.

Civ. A. No. 80–C–986.

United States District Court,
E. D. Wisconsin.

March 10, 1982.

Craig W. Nelson, Piette, Knoll & Nelson, Milwaukee, Wis., for plaintiff.

Peter L. Gardon, Whyte & Hirschboeck, S. C., Milwaukee, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This diversity lawsuit removed from the state courts arises from the alleged breach of an employment agreement between the plaintiff-employee, Vincent J. O'Leary, and the defendant-employer, Sterling Extruder Corporation. The cause is before the court on the defendant's motion for summary judgment on each of the plaintiff's three claims for relief and upon the plaintiff's cross-motion for summary judgment on his first claim.

The defendant is a manufacturer of equipment used in the process of plastics extrusion. The plaintiff was hired as a salesman for the defendant on December 11, 1979, at which time the plaintiff and representatives of the defendant corporation executed two documents. One, entitled "Sterling Extruder Corporation Agreement," (Corporation Agreement) provides in essence that, for a consideration paid by the corporation, the employee agrees to use best efforts to promote the business of the employer; that any inventions made during the term of employment or within a period thereafter shall belong to the employer; that the employee must keep all proprietary data confidential; that all papers, accounts, notes, records, etc., made by the employee during the term of employment belong to the employer; and that the employee will not compete with the employer during or for a period after the term of employment. The other is a letter (Letter Agreement) addressed to the plaintiff and signed by D. A. Swindells, then vice president of the defendant corporation. In the lower left-hand corner of the third and last page of the Letter Agreement is a place for a signature below the language "accepted by:" and a space for a date. In the spaces appear the plaintiff's signature and the date December 11, 1979. The Letter Agreement expresses pleasure that the plaintiff has become a Sterling employee and sets forth specific terms of employment relative to territory, salary, commissions, and definitions.

On August 2, 1980, the plaintiff was terminated from his position as a salesman by the defendant. On September 15, 1980, the plaintiff commenced this action in the Circuit Court for Milwaukee County. It was removed to this court by the defendant.

The plaintiff has alleged three claims for relief: first, for damages resulting from the defendant's breach of the employment agreement by terminating him before the expiration of the term of employment allegedly guaranteed in the Letter Agreement; second, for damages to compensate the injury to his reputation as a salesman; and third, for damages arising from the defendant's alleged violation of the Wisconsin Fair Dealership Law, Ch. 135, Wis. Stats.

### I

### COUNT 1

In his first claim, the plaintiff alleges that his termination in August of 1980, some eight months after his hire, violated the express terms of his agreement with the defendant. His position is based upon the following language contained in the Letter Agreement:

BASE SALARY
    $19,000 per annum.
    A 2-year guaranteed minimum at a
    rate of $30,000 per annum.

The plaintiff contends that this provision constitutes a guaranteed minimum term of employment of two years. The defendant disagrees with this interpretation of the Letter Agreement and relies instead upon a

section of the Corporation Agreement which states:

1. This AGREEMENT may be terminated by either party upon ten (10) days written notice, but the obligations in this AGREEMENT expressed to be binding after termination shall survive said termination.

Arguing that the two instruments must be construed together, the defendant's position is that the termination of the plaintiff was lawful under the ten day notice provision.

■ As a general rule, instruments which are executed at the same time by the same contracting parties, for the same purpose, and in the course of the same transaction will be construed together as if one contract. *James Talcott, Inc. v. P. & J. Contracting Co.*, 27 Wis.2d 68, 76, 133 N.W.2d 473 (1965). Where the instruments relate to different subjects, however, or where they do not have the same object, the agreements are not to be viewed as one. *Brest v. Maenat Realty Co.*, 245 Wis. 631, 635, 15 N.W.2d 798 (1944). These are the standards which govern whether there are two contracts here or only one.

■ The Corporation Agreement contains ten separately numbered and several other unnumbered paragraphs and, as noted earlier, relates principally to the preservation and protection of Sterling trade secrets, patents and other proprietary data. The preliminary recital establishes that Sterling is engaged in the plastics extrusion business, and that

the employee is desirous of being employed or continuing to be employed by STERLING and as part of his employment may discover, invent, develop, and produce new methods, improvements, discoveries, formulae, ideas, inventions and concepts relating to the business of STERLING and will from time to time during the course of his employment receive knowledge and information relating to engineering processes, technical know-how, specialized and unique methods and processes, trade secrets, formulae, research and development studies, inventions and names and lists of names of customers and their requirements, used by STERLING in connection with its business.

No part of the agreement, other than the very first paragraph identifying the parties, appears to have been prepared or tailored especially for Mr. O'Leary: there are no terms relating to salary or benefits, and there is no job description which would, on its face, render the agreement particularly appropriate for O'Leary or for salesmen generally. Certain parts, such as the recital language that the employee "is desirous of being employed or continuing to be employed . . .," and the reference in the non-competition section, ¶ 6(iii), that "if Employee has sales or marketing responsibility . . .," suggest that the agreement is a standard form document used for employees and prospective employees regardless of their particular areas of responsibility. In contrast to this document, the preliminary language of the Letter Agreement indicates that its purpose is to summarize and set forth the particulars of an agreement establishing an employment relationship between O'Leary and Sterling:

Dear Vic:

We are most pleased to welcome you to the Sterling team. For record purposes, I am listing below the substance of our agreement, which becomes effective January 1, 1979.

The letter then details specific terms relating to territory, salary, and payment of commissions.

Despite the fact that both agreements deal generally with an employment relationship, I do not believe they are sufficiently related in subject matter or purpose to be construed as one agreement. The Corporation Agreement narrowly confines itself to trade secret protection, is supported by separate consideration, and does not appear designed particularly to create an employment relationship. On the other hand, the Letter Agreement does by its terms memorialize the creation of an employment relationship, and its terms are consistent with those one might expect in such an agreement. Because the two are

not, in my view, a single agreement but rather two separate agreements, it follows that the ten-day termination provision of the Corporation Agreement must be limited in its effect to the subject matter of that document, and it is not applicable to the Letter Agreement or the issue of the lawfulness of O'Leary's termination thereunder.

■ Thus, the issue becomes narrower: does the presence of the language "A 2-year guaranteed minimum at the rate of $30,000 per annum" under the heading "BASE SALARY" provide, to borrow a phrase from the National Football League, a "no-cut" contract for two years? The answer lies, as it does in any contract interpretation question, in the intent of the parties as expressed by the words they have chosen. *Jones v. Jenkins*, 88 Wis.2d 712, 723, 277 N.W.2d 815 (1979).

The appearance of the disputed term under the heading "base salary" suggests that the term itself is a salary term or that its meaning should be ascertained with salary in mind. The record upon which the parties rely in their summary judgment efforts suggests that the sales territory O'Leary was to take over had not been well developed by O'Leary's predecessor, and that O'Leary had some concern that as a new man in a hitherto neglected or poorly serviced area, he might not be able to expect significant commission income in the beginning. This seems to be a reasonable concern that could well lead to a contract term promising that for a predetermined period of employment one's base salary would be supplemented by amounts (guarantees) sufficient to bring the annual total up to a particular figure—a guaranteed salary. This, of course, is the meaning of this term urged by the defendant. But does the term also carry with it a guarantee of two years' employment?

The plaintiff, using grammatical analysis, asserts that the words "2-year guaranteed" modify the word "minimum," not the word "rate," and thus the term does not refer exclusively to salary but also to a period of time. One cannot dispute that the term refers in some way to a period of time; the problem is determining the significance of the reference. As to the plaintiff's grammatical theory, the word "minimum" by itself is meaningless as a noun; it must be connected to some other concept. Here, the most reasonable candidates are "term of employment" or "salary."

Words or phrases in a contract are said to be ambiguous when they are reasonably susceptible to more than one interpretation. *Jones v. Jenkins, supra; Patti v. Western Machine Co.*, 72 Wis.2d 348, 351–352, 241 N.W.2d 158 (1976); *Lemke v. Larsen Co.*, 35 Wis.2d 427, 431, 151 N.W.2d 17 (1967). Here, there exist two different interpretations of the same language, and I am of the opinion that the language is reasonably susceptible to either.

"After a contract has been found to be ambiguous, it is the duty of the courts to determine the intent of the parties at the time the agreement was entered into. [Citation omitted.] In resolving the ambiguity and determining the parties' intent, the court may look beyond the face of the contract and consider extrinsic evidence. Additionally, the court may rely on the canons of construction to ascertain the intentions of the parties entering into a contract." *Capital Investments v. Whitehall Packing Co.*, 91 Wis.2d 178, 190, 280 N.W.2d 254 (1979).

O'Leary invokes the age-old rule that any ambiguity in a written instrument must be construed against the drafter, and thus reasons that his interpretation of the disputed clause must prevail. I am not persuaded that the application of a static—albeit sometimes useful—canon of construction will satisfactorily resolve this particular question. Each side has submitted extrinsic evidence in the form of affidavits, portions of deposition testimony, and other documents, all designed to clarify the intended meaning of this provision of the agreement. Resort to these aids converts the business of contract interpretation into a matter of fact. *Pleasure Time, Inc. v. Kuss*, 78 Wis.2d 373, 379, 254 N.W.2d 463 (1977).

The plaintiff relies upon deposition testimony of himself and Don Swindells, the individual who signed the Letter Agreement on behalf of Sterling. Both swear the agreement was intended to create a 2-year guaranteed period of employment. While the plaintiff could hardly be expected to say otherwise, Swindells' testimony, as a signatory to the agreement, is significant. The defendant relies upon the deposition testimony of Lucien Yokana, the defendant's president, who states that while Swindells signed the letter, he (Yokana) dictated it, and that he made it clear to O'Leary that the 2-year agreement was purely a salary term contingent upon, but not guaranteeing, his remaining a Sterling employee for the two years. If Swindells is to be believed, the plaintiff's position is strengthened; if Yokana's testimony is believed, then the ambiguity could be resolved for the defendant. However, this is just the sort of determination that is not appropriate in a summary judgment proceeding. *Peoples Outfitting Co., Inc. v. General Electric Credit Corp., Inc.*, 549 F.2d 42, 46 (7th Cir. 1977). Because there exists a genuine issue of fact regarding the intent of the parties in using this language, I conclude that summary judgment cannot be awarded for either party, and thus both motions will be denied as they relate to this claim.

## II

### COUNT 2

■ The plaintiff claims that as a part of his employment agreement he was promised technical and administrative support by the defendant. He claims the promise was breached in that such support was not provided, and that his reputation as a salesman was damaged, presumably because Sterling's lack of support placed him in a bad light in the eyes of his customers. The complaint alleges that the promised support was a part of his employment contract, but the plaintiff does not, in either the complaint or any of the papers accompanying this motion, identify with particularity the contract provision containing this promise. I have scoured the two agreements executed by O'Leary in connection with his employment by Sterling and have been unable to find any provision which even remotely approaches a promise by Sterling to provide technical or administrative support. The defendant assumes that the recital paragraph of the Corporation Agreement is the source of this claim and argues that that provision does not constitute a promise to provide administrative support.

Assuming this is the contractual provision upon which the claim is based, I concur with the defendant's views. The Corporation Agreement, as noted earlier, is a document whose obvious purpose is to provide the defendant with protection for its proprietary data and trade secrets. The recital, viewed in the context of this purpose, is clearly not a promise to supply such information to the employee, but rather a recognition that, in the course of the employment relationship, such information will inevitably come into the possession of the employee, thereby necessitating (in the company's view) the protection afforded by the agreement.

■ Another problem with Count 2 concerns the availability of damages for injury to reputation in a breach of contract action. The plaintiff cites no authority permitting the recovery of such damages, but the defendant, arguing that they are not recoverable, cites several in support of that position. The courts seem to be in general agreement that damages for injury to reputation are not properly awardable in a breach of contract suit. *Miller v. Board of Education*, 98 Ill.App.2d 305, 240 N.E.2d 471, 475 (1968) (wrongfully discharged teacher not permitted to recover); *Winship v. Brewer School Committee*, 390 A.2d 1089, 1094–5 (Me.1978) (terminated and subsequently reinstated teacher not entitled to recover); *Amaducci v. Metropolitan Opera Assn.*, 33 App.Div.2d 542, 304 N.Y.S.2d 322, 323 (1969) (wrongfully terminated orchestra conductor not permitted to recover); *Skagway City School Board v. Davis*, 543 P.2d 218, 225 (Alaska 1975) (dismissed teacher not entitled to recover); *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437,

446 (1st Cir. 1966), *cert. den.* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966) (terminated automobile dealer cannot recover from regional distributor or manufacturer); *Pryles v. State*, 86 Misc.2d 205, 380 N.Y.S.2d 429, 433 (1975) (teaching doctor dismissed for cause not permitted to recover); *Quinn v. Straus Broadcasting Group, Inc.*, 309 F.Supp. 1208, 1210 (S.D.N.Y.1970) (wrongfully terminated radio talk show moderator not permitted to recover).

Wisconsin adheres to this view as well. In *Smith v. Beloit Corp.*, 40 Wis.2d 550, 559, 162 N.W.2d 585 (1968), its Supreme Court held that damages for injury to reputation were not recoverable in a breach of contract action:

> "What then is the measure of damages? The trial court listed a number of factors which he held the jury was entitled to consider in fixing damages. They included the humiliation sustained by a proud man, permanent injury to professional reputation and additional living expenses occasioned by his new employment. These elements of damages aside from being quite speculative in nature, appear to us to fall outside the pale as being outside the reasonable contemplation of the parties and without basis in the record here established. It seems to us that the proper measuring stick for damages is the actual wage loss and actual expenses of relocation incurred by plaintiff and established by the record."

I see no reason to distinguish the instant case from the others cited above, as the plaintiff urges, on the ground that all the others involved breaches by wrongful termination of an employment agreement, where here the alleged breach upon which the claim is based is a failure to perform under a term of the agreement. The basic principle, as noted in *Smith*, is whether the damages sought were within the reasonable contemplation of the parties at the time the contract was formed. Here, as in the other cases, the damages sought by the plaintiff fall "outside the pale." Based upon the foregoing authorities, it is clear to me that the plaintiff cannot recover damages for injury to his reputation in this case. The second count fails to state a claim upon which relief can be granted. The motion to dismiss it will be granted.

### III

### COUNT 3

■ The plaintiff alleges that the relationship existing between him and the defendant was a dealership under Ch. 135, Wis.Stats., and that his termination was a violation of the protections offered by that chapter.

Section 135.02(2), Wis.Stats., defines dealership as follows:

> (2) "Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logo type, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Recently the Wisconsin Supreme Court, in *Foerster v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 313 N.W.2d 60 (1981), held that a manufacturer's representative who did not participate in the process of preparing estimates or quotes, did not approve, accept or reject orders, negotiate terms or credit arrangements, did not purchase or keep an inventory of the manufacturer's products, and did not bill customers or participate in collections, was not a dealer within the meaning of the Wisconsin Fair Dealership Act. The court stated:

> The description of the businesses which the Fair Dealership Law was intended to cover indicates that the law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or "good will" as a part of their association with the grantor of the dealership and is, thus, consistent with common or accepted perceptions of the words franchise or dealer-

ship. It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice. None of the businesses mentioned in this description resembles the type of manufacturer's representative business involved in this case.

*Id.* at p. 24, 313 N.W.2d 60.

The documents submitted in support of this motion indicate that O'Leary, like Foerster, did not prepare price quotations, did not invoice the defendant's products, did not ship or deliver the defendant's products, did not bill customers or collect payments from them, and did not purchase or keep any inventory of the defendant's products. Given the nature of O'Leary's activities, the fact that he was compensated in part by salary, and that his business expenses were all paid by the defendant, I believe the *Foerster* decision compels the conclusion that the employment relationship in question here was not a dealership. See also: *E. A. Dickinson v. Simpson Electric Co.,* 509 F.Supp. 1241 (E.D.Wis.1981).

Despite the ease with which this conclusion is reached, O'Leary argues that *Al Bishop Agency, Inc. v. Lithonia-Division of National Service Industries, Inc.,* 474 F.Supp. 828 (E.D.Wis.1979) counsels a different result. The court in *Al Bishop* determined that a manufacturer's representative who did not participate in the billing of customers or the delivery of the manufacturer's products was a dealer nonetheless because the plaintiff was involved in the actual solicitation of offers to purchase products, the plaintiff engaged in solicitation on a one-to-one basis with customers, the plaintiff performed customer service functions to satisfy the purchasers of products once the sales were made, and the plaintiff held himself out as an agent of the defendant by having the defendant's name on the plaintiff's business cards.

The *Foerster* decision raises some questions about *Al Bishop.* The relationship between the parties in that case, like the one in this case, certainly does not comport with "common or accepted perceptions of the words franchise or dealership." *Foerster, supra* 105 Wis.2d at 24, 313 N.W.2d 60. I decline to follow *Al Bishop,* not only because of the *Foerster* decision, but because to do so would convert a conventional employee-employer relationship into a dealership and would spell uncertainty for any employer of sales personnel. Because I do not find the relationship in this case to be a dealership within the meaning of Ch. 135, Wis.Stats., the third count of the plaintiff's complaint fails to state a claim upon which relief can be granted.

Based upon the foregoing,

IT IS ORDERED that both motions for summary judgment with respect to the first count of the plaintiff's complaint be denied, and that the defendant's motion for summary judgment with respect to Counts 2 and 3 be granted.

IT IS FURTHER ORDERED that a status conference be held in this matter on April 22, 1982, at 8:30 a. m.