**Richard E. MOORE, Plaintiff,**

v.

**TANDY CORPORATION, RADIO SHACK DIVISION, A Foreign Corporation, Defendant.**

**No. 85–C–120–C.**

United States District Court, W.D. Wisconsin.

March 19, 1986.

---

1038

Sally March, Aagaard, Hurley, Burish & Milliken, Madison, Wis., for plaintiff.

Richard A. Hollern, Thomas M. Pyper, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for monetary relief in which plaintiff alleges that defendant violated the Wisconsin Fair Dealership Law, Wis.Stats. § 135.01, *et seq.*, by terminating plaintiff without good cause or proper notice. In addition to his fair dealership claims, plaintiff asserts claims for interference with contract and for breach of agreements to supply plaintiff with a certain level of inventory goods and to expend certain amounts of money on advertising.

Originally filed in the Dane County Circuit Court, this case was removed to this court by defendant pursuant to 28 U.S.C. § 1441. Jurisdiction is based on 28 U.S.C. § 1332. The case is before the court on cross-motions for partial summary judgment in which plaintiff seeks judgment on his fair dealership claims and defendant seeks their dismissal.

From the proposed findings of fact, affidavits and depositions submitted by the parties, and for the sole purpose of deciding these motions, I find that there is no genuine dispute about the following material facts.

## FACTS

Plaintiff is a resident of Mt. Horeb, Wisconsin. Defendant is a Delaware Corporation with its principal place of business in Ft. Worth, Texas. Defendant uses the trade name "Radio Shack" and offers electronic equipment for sale at Radio Shack retail stores.

At some time in 1972, plaintiff wrote defendant to request information about Radio Shack franchise stores. In return, he received a brochure soliciting applicants for Radio Shack's "special manager incentive program." On August 14, 1972, plaintiff wrote to defendant for further information on this program. In his letter, plaintiff asked defendant's employee Jim Lees whether the company allowed individuals to own their own stores under a franchise agreement and whether the manager of a company store had any say in the selection of a site. In a letter dated August 18, 1972, Lees responded that the company once had a franchising program, but had discontinued the program for all but the existing franchise stores and no longer offered applicants the option of owning their own stores. He informed plaintiff that the company chose the sites for its stores. Lees described the special manager incentive program as an arrangement under which a manager was expected to put up one half of the total investment.

Prior to the institution of the special manager incentive agreement in 1973, defendant had entered into "joint venture" agreements with certain store managers. These agreements differed from the special manager incentive program in that they had an automatic renewal clause. After 1973, defendant asked these managers to sign releases of their joint venture agreements and enter into special manager incentive agreements. Certain dealer and franchise stores established before the inception of the special incentive agreement continue to operate. Unlike the stores operating under the special management incentive agreement, these dealer and franchise stores are independent businesses whose operations are independent of defendant's control. Dealers and franchisers buy inventory directly from defendant and set their own prices for merchandise. Plaintiff was aware that these dealer and franchise stores existed and that he could not buy one.

Plaintiff entered into a Radio Shack special manager incentive agreement with defendant on July 13, 1973. From July 13,

1973 to July 31, 1984, plaintiff managed a Radio Shack store in Madison, Wisconsin under a series of special manager incentive agreements, the last of which was dated August 1, 1982. Plaintiff did not raise any objection to the terms of the initial agreement or any subsequent agreement before these agreements were signed.

Under each of the agreements it entered into with plaintiff, defendant purchased the fixtures and supplied the inventory for the store. With each agreement, plaintiff paid defendant a "security deposit" in an amount equal to one half of the value of the fixed assets in the store plus one half of the inventory. Managers of Radio Shack stores not participating in the special manager incentive program were not required to make a payment formally called a security deposit. Instead, these managers have a certain percentage of their annual bonuses withheld as security.

The amount of the security deposit was recalculated each time plaintiff renewed his agreement with defendant. The amount of plaintiff's deposit increased from $15,000 in 1973 to $70,367.74 in 1982, increasing with each renewal except for the last in an amount proportionate to the value of the fixed assets and inventory. In 1982, the deposit was the same as for the previous year. None of the agreements required defendant to pay plaintiff interest on the amounts held as security, and defendant never did.

Apart from the absence of a certain provision concerning deductions from security deposits, the terms of the 1982 agreement were in all respects representative of the relationship between the parties between 1973 and 1984.[1] Under the 1982 agreement, as under the previous agreements, plaintiff's security deposit gave him no ownership rights in the inventory, fixtures or furniture of the store. The 1982 agreement provided

> This agreement does not give Manager any ownership interest in the Store, Employer's bank account, lease, trade names, trademarks, service marks, the merchandise inventory, goodwill or any of Employer's assets (fixed or intangible). The title and ownership of such assets are retained by employer.

The agreement provided that the defendant could withdraw funds from plaintiff's security deposit for losses not covered by insurance that were the result of plaintiff's wilful or dishonest act, for plaintiff's gross mismanagement of the store, for liabilities occasioned by plaintiff's breach of the agreement, or for any losses caused by plaintiff's failure to manage the store with "a reasonable degree of care, skill and judgment."[2]

The 1982 agreement was described as a "contract of employment." It designated defendant as "employer" and plaintiff as "manager." The agreement provided that "[s]ubject to the supervision and pursuant to the orders, advice, direction and control of Employer, Manager shall manage and operate the Employer's store, and shall perform such other duties as are customarily performed by one holding the position of Manager in other Radio Shack Stores." The agreement further provided that "[i]t is the intention of the parties to create an employee-employer relationship, and not otherwise."[3]

---

**1.** Under the special management agreements from 1973 until 1981, defendant could debit plaintiff's security deposit if the store's sales did not meet a contractual standard. While the parties' proposed findings of fact contain no other specific reference to changes in the agreements' provisions between 1973 and 1981, it is unclear whether the agreements were completely unaltered during this time period.

**2.** Defendant asserts that plaintiff assumed no risk for the destruction of the inventory by fire, and that plaintiff was entitled to the full return of the security deposit at the end of the business relationship unless defendant had suffered losses occasioned by plaintiff's failure to abide by the management obligations set forward in the agreement. Plaintiff objects to this assertion that he assumed no risk, on the ground that nothing in the agreement specifies what would happen in the event of a loss of inventory, insured or uninsured.

**3.** Store managers who were not participants in the special manager incentive program had no written contract with defendant. Defendant considered their employment terminable at will.

The 1982 special manager incentive agreement provided that defendant would be solely responsible for selecting and leasing the site of the store, selecting and delivering store fixtures; selecting and furnishing merchandise inventory and determining the amount of inventory; selecting sale merchandise; preparing advertisements; selecting a local bank; preparing and filing all reports for store personnel, including payroll, tax and other wage reports; managing the petty cash fund and determining store hours.

The 1982 agreement provided that all of plaintiff's actions would be subject to the review and approval of his employer. All credit extended by the store would be subject to final approval by Tandy. Plaintiff and defendant would be jointly responsible for the collection of money due on charge accounts. Plaintiff could not incur any debt, charge or obligation in defendant's name. Defendant's accounting department would pay all of the store's fixed and variable expenses. Plaintiff would not be personally liable for any store expense. Defendant would withhold all federal, state, and city income and payroll taxes for all store employees, including plaintiff. Defendant would establish and maintain bank accounts for the store. Plaintiff would collect money from sales on a daily basis and forward all deposit slips from those sales to defendant. Plaintiff would deposit all daily funds in accordance with defendant's written directions.

Between 1973 and 1984, the relationship between the parties proceeded according to contract. Defendant chose a site in Madison for the first store plaintiff managed in 1973. Defendant later changed the location of the store to East Towne Shopping Mall, and then to a new location within the mall. Plaintiff had no part in any of the decisions on the location of the store.

During the course of the parties' business relationship, defendant supplied the petty cash for the beginning of each day's business. At the end of the day, plaintiff deposited the monies in a bank account established by defendant. After it was deposited, the money was transferred to defendant's principal place of business in Fort Worth, Texas. Defendant received the full amount produced by the sale of an item of inventory. Plaintiff had no access to the money, and could not withdraw funds even if the day's petty cash advance was insufficient to meet the store's needs.

Plaintiff was responsible for maintaining daily sales and inventory records and for authorizing returns, exchanges and repairs of merchandise. Defendant established the store's hours, set the prices of merchandise, and designated all price discounts and sale items. Plaintiff had no authority to disregard defendant's pricing directives. All merchandising at the store was directed by defendant through programs sent from Fort Worth for implementation by plaintiff.

Plaintiff was responsible for training the sales employees of his store.[4] While the special manager incentive agreements gave plaintiff the authority to hire and fire employees for the store he managed, defendant's district and regional managers conducted all hiring and firing during the time plaintiff served as manager. Defendant also decided whether to transfer employees into or out of the store.

Under the terms of the 1982 agreement, plaintiff received no fixed salary or commission. Plaintiff's compensation was calculated according to a formula set forth in the agreement, under which the store's variable expenses were deducted from one-half of the store's adjusted profit to arrive at plaintiff's share of the profits.[5]

**4.** Defendant asserts that plaintiff was required to train employees who were eventually to become managers of other stores. This assertion is not supported by the record. James Romero, defendant's regional manager for the Houston area, testified at his deposition that it was not company policy for managers to train personnel for stores other than their own, but that such training was encouraged.

**5.** Managers of stores not participating in the special manager incentive agreement are guaranteed a minimum salary or wage. They also earn commissions on their personal sales and a bonus based on a percentage of net profits.

The adjusted profit was calculated by subtracting from gross profit certain expenses including accounting fees, advertising expenses, commercial credit plan charges, repairs or warranted goods, and "return on investment charges" assessed when inventory levels exceeded the amount of the manager's security deposit.[6] The deduction of these expenses affected each party's share of the profits equally.

Variable expenses were deducted from one-half of adjusted profit to arrive at plaintiff's compensation. Variable expenses included the wages and compensation of all store employees except for the manager; payroll, worker's compensation and unemployment compensation taxes; and the employer's contributions to the Tandy stock purchase and investment plans. Other variable expenses included upkeep and maintenance, utilities, postage, heating and air conditioning equipment, seasonal store decorations, store supplies, merchants' association dues and common area maintenance fees when not required by lease, burglar alarm rental, trash removal, travel expenses, returned check expenses[7] and bad debt expenses. Variable expenses affected only plaintiff's share of the profits.[8]

Fixed expenses included rent, insurance, property taxes, payroll taxes on the manag-

er's compensation, and the employer's contribution to the stock purchase and investment programs on behalf of the manager. These amounts were paid by the defendant and did not enter into the formula for calculating plaintiff's compensation.

Defendant paid all the store's expenses. Plaintiff had no discretion in the payment of expenses, and was not entitled to any compensation until after the expenses had been paid. In months when variable expenses equalled adjusted profits, plaintiff received no compensation. When variable expenses exceeded adjusted profits, the amount of excess was deducted from plaintiff's compensation for the next month.

Both plaintiff and defendant treated plaintiff's compensation package as employee income. Defendant withheld state and federal income taxes from plaintiff and paid his FICA contributions. Plaintiff claimed his compensation from defendant on his state and federal tax returns as wages or salaries. Plaintiff's W–2 forms showed defendant as employer and plaintiff as employee. Plaintiff did not file forms for sole proprietorship income, for partnership income, or for self-employment tax. Defendant made contributions on plaintiff's behalf for group health and dental programs.

Their expenses are charged to the store and affect their compensation only to the extent that the expenses reduce the profit on which their bonuses are based.

**6.** Although he was under no contractual obligation to do so, plaintiff occasionally repaired Radio Shack merchandise that had been returned to the store. Plaintiff sent other merchandise to the Tandy repair center. Plaintiff and defendant shared the cost of repairing warrantied goods and the income from the repairs of nonwarrantied goods.

**7.** Plaintiff subscribed to a check guarantee service at his own expense to protect himself against returned checks. Joseph Seidl, the district manager for Radio Shack in plaintiff's district, criticized plaintiff for subscribing to this service because it did not comply with the check verification procedure set forward in defendant's policy and procedure manual.

Returned check expenses had no effect on the guaranteed income of managers not participat-

ing in the incentive program. They affected only the net profits upon which these managers' bonuses were based.

**8.** Each party challenges the other's characterization of the variable expenses deducted from adjusted profits to arrive at plaintiff's compensation. Defendant objects to plaintiff's representation of these expenses as expenses personal to the plaintiff in view of the fact that plaintiff had no discretion with respect to their payment. All expenses were paid by the company and allocated against the store under the company's bookkeeping system. Plaintiff challenges the accuracy of defendant's statement that variable expenses were allocated against the store. Unlike the fixed expenses borne only by defendant or the "shared" expenses deducted from gross profit to calculate adjusted profit, variable expenses affected only plaintiff's share of the profits. These differences in characterization do not amount to a dispute of material fact.

Under the 1982 agreement and previous agreements, plaintiff was required to indemnify defendant for claims arising out of the manager's failure to conduct business in accordance with the terms of the agreement and for negligence or gross mismanagement of the store.[9]

The special manager incentive agreement set a maximum amount of inventory to be carried by Radio Shack store managers. If the store's inventory reached a level greater than twice the manager's security deposit, the store was charged a 10% per annum "return on investment charge," which was shared by defendant and the manager.[10] The agreement expressly provided that the company would have the right to limit the amount of inventory in the store. Before 1984, the company consistently allowed plaintiff to order more inventory than his security deposit would have otherwise allowed.

When plaintiff's agreement was renewed in 1982, the percentage sales gain in the store he managed exceeded the average percentage of all stores in the United States by 21%. On June 1, 1983, Joseph Seidl became the defendant's manager for the district that included plaintiff's store. At that time, plaintiff was the only manager in the district participating in the special manager incentive agreement. Seidl had no previous experience with a store operating under this type of agreement. From the beginning of his tenure as district manager, Seidl calculated plaintiff's allowable inventory using the same formula he applied to every other store in the district and did not take plaintiff's security deposit into account in making this calculation.

In July, 1983 defendant revised its method of calculating plaintiff's allowable inventory. As early as September 22, 1983, plaintiff was aware that Seidl was calculating maximum inventory in a manner differ-

ent from what plaintiff considered proper. Plaintiff prepared a written analysis for Seidl demonstrating how plaintiff thought his inventory level should be determined and had several subsequent discussions with Seidl on the subject. In October, 1983 plaintiff complained to Robert Bourland, defendant's divisional vice president, that the incorrect calculations resulted in inventory levels too low to satisfy sales performance criteria.

Each month in fiscal year 1984 except for November, plaintiff was not allowed to order as much inventory as his contract permitted. Plaintiff's inventory in these months fell to a level below that for the corresponding months in the previous year.

On November 23, 1983, plaintiff received a letter from defendant's regional manager, James Romero, informing plaintiff that the company was dissatisfied with his performance, but hoped to renew his contract. The letter set forward two criteria for the contract's renewal: (1) that plaintiff's sales gains equal or exceed the average for stores in his district; and (2) that the "realized gross profit" from plaintiff's store equal or exceed the average of all stores in the country operating under the special manager incentive agreement.

Only four of the 28 stores in plaintiff's district were located in major malls. The three other mall stores were held to a higher standard of sales performance than plaintiff's.

Plaintiff's contract with defendant expired without renewal on July 31, 1984. The decision not to renew plaintiff's contract was made by defendant's divisional vice-president Robert Bourland upon the recommendations of regional manager James Romero and district manager Joseph Seidl. Seidl set forward the reasons for his recommendation in a memorandum to

---

**9.** The store operating manual and employee handbook for managers of stores not participating in the special manager incentive program contain no explicit indemnification provision. Defendant claims that the same purpose is served by the withholding of these managers' bonuses for security.

**10.** The maximum inventory for stores not operating under the agreement was determined according to a formula based on sales.

Bourland dated May 8, 1984. Seidl criticized plaintiff's training of sales staff and of management trainees designated to manage other Radio Shack stores. His memorandum was based on a series of store inspection reports for the months of August, September and November, 1983 and February, March and April, 1984. Copies of these reports, which noted deficiencies in the areas of merchandising, sales training, and the acquisition of customer addresses for repeat sales, had been sent to plaintiff. Seidl told plaintiff that his performance would not be considered satisfactory until he remedied the deficiencies noted in the reports, but did not specifically inform plaintiff that these deficiencies were grounds for terminating his contract.

After receiving Seidl's recommendation, Romero also recommended that plaintiff's contract not be renewed. Romero based his recommendation on the sales performance of plaintiff's store for the previous year and on his perception that the plaintiff was not an aggressive manager.

On previous occasions when his contract had come up for renewal, plaintiff received no communications from defendant other than an approval form signed by the divisional vice president after the renewal had been approved. Defendant had never raised "realized gross profits" as a criterion for the renewal of the contract and the term had never appeared on any of the financial reports plaintiff received. Plaintiff did not know what the term meant. He was never informed of the national average for realized gross profit. After receiving the November 23, 1983 letter, plaintiff did not contact the company for an explanation of these terms.

On July 31, 1984, the same day his contract expired, plaintiff applied for unemployment compensation benefits. Defendant returned plaintiff's security deposit. There is a dispute between the parties over the correct accounting of the returned deposit, but not over plaintiff's entitlement to its return. Plaintiff was unemployed until September 1985. Since August 1, 1984, the East Towne Radio Shack store has been managed by a manager who does not participate in the special manager incentive agreement. Plaintiff filed this action on December 28, 1984.

## DISPUTED FACTS

The parties dispute whether plaintiff met the criteria for the renewal of his contract set forward in the letter of Joseph Seidl dated November 23, 1984. Plaintiff claims that he met the criterion that his sales gains equal or exceed the average sales percentage for the district. Plaintiff states that the sales average of the store he managed was less for the district average in most of 1984 except for June, when it was twice the average, and July, when it equalled the average. Defendant states that the percentage of plaintiff's sales gain never equalled or exceeded the district average.

## OPINION

The threshold issue in this case is whether plaintiff was a dealer within the meaning of the Wisconsin Fair Dealership Law, Wis.Stat. § 135.02(2) and (3). If so, it must be determined whether defendant terminated plaintiff with good cause and adequate notice.

The statutory criteria of a dealership are:

1. a contract or agreement between two or more persons;

2. by which a person is granted

    a. the right to sell goods or services;

    b. the right to distribute goods or services; *or*

    c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, *and*

3. in which there is a community of interest in the business of

    a. offering goods or services;

    b. selling goods or services; or

    c. distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis.Stat. § 135.02(3); *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 300 N.W.2d 63 (1981).

When the facts concerning a contract are not in dispute, the question whether a contract creates a dealership is one of law, not fact. *Kania v. Airborne Freight Corp.*, 99 Wis.2d at 762–63, 300 N.W.2d 63. Once a business relationship is found to be a dealership, the fair dealership law is to be liberally construed to effectuate its purpose in protecting dealers against unfair treatment by grantors. Wis.Stat. § 135.025(1). However, the definition of a dealership is not to be construed expansively. *Kania* at 775–6, 300 N.W.2d 63; *H. Phillips Co. v. Brown Forman Distillers Corp.*, 483 F.Supp. 1289, 1291 (W.D.Wis.1980).

Noting that a purpose of the fair dealership law is to correct an imbalance in the positions of grantors and dealers, plaintiff urges that the language of his agreement with defendant be construed liberally because he lacked the power to change it. Specifically, plaintiff claims that when he first entered into a special manager incentive agreement with defendant in 1973, he was powerless to insist on an automatic renewal clause similar to that of defendant's earlier joint venture agreements or to change the language of the agreement that designated him as an "employee" and characterized his contribution to the business as a "security deposit."

The focus of inquiry here is not on the circumstances surrounding the original agreement between the parties, but on the operative terms of the 1982 special manager incentive agreement that form the basis of this suit. The parties concur that the 1982 agreement was not an automatic renewal of the terms of an ongoing relationship between the parties, but rather a new understanding finalized after the effective date of the Wisconsin Fair Dealership Law. *See Kealey Pharmacy and Home Care Service, Inc. v. Walgreen Co.*, 539 F.Supp. 1357, 1363, *aff'd in part, rev'd in part*, 761 F.2d 345 (7th Cir.1985). Plaintiff's statements that he originally wished to buy a franchise store and that his original contract with defendant resembled the prior joint venture agreements without an automatic renewal clause do not compel the conclusion that the initial agreement or subsequent agreements were dealerships under the act. While plaintiff's argument that he lacked the bargaining power to change the agreement is not without force, the question whether his business relationship with defendant constitutes a dealership is to be determined on the basis of the express language of the 1982 agreement and the manner in which the agreement operated. That the terms of the contract appear to be crafted in such a way as to limit defendant's liability under the fair dealership law should heighten the scrutiny of its terms, but does not dictate that they be read expansively.

I conclude that plaintiff's business activities satisfied the first and second statutory criteria for a dealership (contract between two or more persons; right to sell goods or services and to use trademark), but did not satisfy the third (community of interest in the business).

*Contract*

The written special manager incentive agreement between plaintiff and defendant satisfies the first step of the dealership analysis required by the act.

*Right to sell or distribute goods or services*

Defendant argues that plaintiff had no right to sell or distribute Radio Shack goods, but was merely a "mechanical moneytaker" no different from any other salesperson. In support of this argument, defendant relies on the contract language designating plaintiff as an employee and the provision that plaintiff had no ownership interest in the goods that he sold.

It is clear that the definition of a dealership does not extend to a conventional employer-employee relationship. *O'Leary v. Sterling Extruder Corp.*, 533 F.Supp. 1205 (E.D.Wis.1982); *Quirk v. Atlanta Stove Works, Inc.*, 537 F.Supp. 907 (E.D. Wis.1982). In *O'Leary*, Judge Evans

ruled that a salesperson who neither purchased a manufacturer's products nor kept them on hand was a mere employee not entitled to the protections of the fair dealership law. 533 F.Supp. at 1211. Similarly, the plaintiff in *Quirk* was denied the status of a dealer because he was a manufacturer's representative whose role was merely to solicit customers for his employer's products, 537 F.Supp. at 910, and who made no investment in physical facilities or good will, maintained no inventory, was not required to extend credit, had no control over the prices of the goods he sold, and had taxes withheld from his paychecks by his employer, who also made contributions on plaintiff's behalf for unemployment and worker's compensation insurance. *Id.* at 911.

█ Plaintiff urges the court to look beyond contractual labels to the substance of his rights and responsibilities under the special manager incentive agreement. Unlike the plaintiffs in *O'Leary* and *Quirk*, plaintiff maintained the inventory at his store and had responsibilities beyond the mere solicitation of customers. Plaintiff was responsible for supervising the sale of goods, for approving credit subject to defendant's approval, for training and compensating sales personnel, and for authorizing returns, exchanges and repairs. Although defendant argues that plaintiff had even less responsibility than a manufacturer's representative because he did not pay rent, negotiate leases, set prices or store hours, or design advertising, I find the argument unconvincing.[11] Plaintiff had the authority to hire and fire, even if he did not exercise it during his relationship with the company, and was responsible for meeting the payroll of the employees of his store. That defendant withheld taxes from plaintiff's earnings and paid unemployment insurance for him is not in itself dispositive of plaintiff's status as mere employee.

The chief difference between plaintiff and O'Leary or Quirk is that plaintiff advanced a significant sum of his own money for the business venture. He was not the conventional employee described in those cases.

It must next be determined whether plaintiff's security deposit was sufficient to give him the right to sell.

Plaintiff argues that his contribution of some $70,000 for the store's inventory was a substantial investment under the terms of the act despite defendant's characterization of it as a security deposit, and that defendant's reservation of title to the goods did not strip plaintiff of the right to sell them. In support of this argument he cites the first opinion in *Wilburn v. Jack Cartwright, Inc.*, 514 F.Supp. 493, 498 (E.D.Wis.1981), *rev'd and remanded*, 676 F.2d 698 (7th Cir.), *on remand*, 543 F.Supp. 174 (E.D.Wis.1982), *rev'd*, 719 F.2d 262 (7th Cir.1983), in which Judge Gordon adopted a broad view of the right to sell, finding "nothing in the statute that defines a dealer as one who owns goods or maintains an inventory of goods." Defendant contends that the Court of Appeals for the Seventh Circuit rejected this view explicitly in an opinion rendered in the second appeal of that case, in which the court stated that

> Where a dealer purchases goods for resale, he makes the sort of substantial investment contemplated by the [Wisconsin Fair Dealership Law]; however, where a sales representative merely solicits orders that are subject to the manufacturer's final approval, no such investment has occurred.

*Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262 at 265.

*Wilburn* involved a travelling manufacturer's representative who solicited orders for the products of four furniture manufacturers. Under the contract at issue in that case, Wilburn had no authority to accept

---

**11.** As further evidence of what it argues is plaintiff's lack of ownership and his lack of control over the operations of the store, defendant offered as proposed findings of fact a description of the events surrounding the opening of a computer department in his store. Although uncontested, these proposed findings were not found as fact because the degree of plaintiff's responsibility for the layout and design of his store, or the choice of merchandise to be sold, is immaterial to the determination whether plaintiff is a dealer under the law.

orders for a particular manufacturer's goods; but was required to send them to the manufacturer for acceptance. He trained sales personnel in the preparation of order forms and arranged for repair work when authorized by the manufacturer. He paid no franchise fee, incurred no capital expense, maintained no inventory, and was not required to advertise the manufacturer's product line. Although he performed some informal credit checks on his customers, Wilburn was not required to extend credit or to assume the risk of late payment or nonpayment by the manufacturer's customers. The manufacturer paid all the costs of promoting its product. Wilburn received a commission for each sale.

The court of appeals concluded that Wilburn did not have the right to sell because he lacked the authority to commit the manufacturer to a sale; he did not have the "unqualified authorization to transfer the product at the point and moment of the agreement to sell." *Wilburn,* 719 F.2d 262 at 265 (quoting *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 26, 313 N.W.2d 60 (1981)). No such limitation existed for the plaintiff in the present case. Although his contract with defendant provided that all his actions were subject to the company's approval, it made him responsible for the sale of Radio Shack products and he sold them on a regular basis without the need for the company's approval.

I am not convinced that the court of appeals' final word in *Wilburn* makes ownership of inventory an essential component of the right to sell. The court's statement that the purchase of goods for resale constitutes significant investment is posed in contradistinction to the mere solicitation of orders subject to the manufacturer's approval. Nowhere does the opinion specifically reject Judge Gordon's view that a store manager need not own his goods to have the right to sell them.

■ The Wisconsin Fair Dealership Law is intended to protect

> those small businessmen who make a substantial financial investment in inventory, physical facilities, or "goodwill" as part of their association with the grantor of the dealership and is, thus, consistent with common or accepted perceptions of the words franchise or dealership. It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice.

*Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d at 24, 313 N.W.2d 60. The critical question in determining whether an individual is a dealer is not whether he has title to the inventory he sells, but whether he stands to lose a significant amount of the money he has advanced for physical facilities and inventory. By itself, reservation of title in the grantor cannot defeat an individual's claim to dealership status. Plaintiff's role was greater than the mere solicitation described in *Wilburn.* The nature of plaintiff's investment in the business is closely tied to the question of community of interest, discussed below.

*Right to use trademark, tradename or logo*

Defendant maintains that a grant to the use of a trademark involves more than permission to display the manufacturer's name and logo; it requires a grant to use the logo coupled with ownership of the store in which it is displayed. Defendant argues that because defendant did not grant plaintiff the right to use the trademark for his own purposes, as in using the Radio Shack name outside the store in opening his own satellite location or service center, plaintiff's contract does not include a right to use the trademark as contemplated by the act.

In support of this argument, plaintiff cites *Kealey Pharmacy v. Walgreen Co.,* 539 F.Supp. 1357 (W.D.Wis.1982) (liability); 607 F.Supp. 155 (W.D.Wis.1984) (damages); *aff'd in part, vacated in part,* 761 F.2d 345 (7th Cir.1985), a case in which I held that independently owned Walgreens pharmacies were covered under the fair dealership law. In reaching the conclusion that the store owners had the right to use the

Walgreen trademark, I placed weight on the substantial financial investment made by the owners of the pharmacies in their stores and fixtures and the fact that the managers of these pharmacies spent their own money on advertising. 607 F.2d at 165. The fact that the managers of these pharmacies owned their own stores was not an essential part of the decision.

■ More important than the formal ownership of a manufacturer's trademark is the extent of its actual use and its promotion. Unlike the plaintiffs in *Wilburn* or *Foerster*, plaintiff paid to advertise the Radio Shack trademark and displayed only Radio Shack's name in his store.[12] Defendant attempts to minimize the importance of plaintiff's role in the advertising of Radio Shack products by pointing out that plaintiff had no involvement in choosing the advertisements, which were dictated by defendant's central offices in Fort Worth. This argument is unpersuasive. As plaintiff notes, a grantee's lack of independence in price-setting, fixture selection and merchandising is a common feature of franchises otherwise entitled to the protections of the Wisconsin Fair Dealership Law. *See* Brown, Franchising Realities and Remedies § 1.03–1.05 (1984). The actual ownership and control of the trademark is less important than the manner in which its use ties the fortunes of the store to the reputation of the company. The dispositive factor in *Kealey* was the dependency of the pharmacies on the Walgreen name, not the actual ownership of the trademark. *Kealey*, 607 F.Supp. at 165.

### Community of Interest

■ The critical question in this case is whether plaintiff's fortunes were so closely tied to defendant's that a community of interest existed between them. As defined in the statute, a community of interest requires "a continuing financial interest by the grantor and the grantee in either the operation of the dealership business or the marketing of such goods and services." Wis.Stat. § 135.02(4). In determining whether a community of interest exists, the relevant factors are the nature of plaintiff's security deposit, the allocation of the risk of nonpayment, and plaintiff's compensation.

■ Defendant argues that plaintiff's security deposit was not an investment at all in the sense that there was any risk attached to it. It notes that the security deposit was neither a purchase price for inventory nor a nonrefundable franchise fee, that plaintiff was entitled to the return of his security deposit if he fulfilled the management obligations entrusted to him by the company, and that plaintiff did receive return of the deposit.[13]

Plaintiff's entitlement to the return of his deposit was not unconditional. Defendant could withdraw funds from the deposit either during the course of the business relationship or upon its termination for losses not covered by insurance that were the result of plaintiff's wilful or dishonest act, for plaintiff's gross mismanagement of the store, for liabilities occasioned by plaintiff's breach of the agreement, or for any losses caused by plaintiff's failure to manage the store with "a reasonable de-

12. Although defendant disputes plaintiff's contention that he paid 50% of the store's advertising costs, arguing that defendant only took a percentage of the store's profits to finance its national advertising campaign, it cannot seriously argue that plaintiff did not pay for the right to use the Radio Shack name because he did not spend his own money for advertising, when the deduction of advertising costs from gross profits directly affected plaintiff's share of those profits.

13. The difference between the "security" provided by managers of Radio Shack stores with a special manager incentive agreement and those without is of little help in deciding whether plaintiff's contract gave him a community of interest with defendant. Defendant claims that the bonus withheld from managers not participating in the program is every bit as significant as a security deposit. Plaintiff maintains that there is no indication that the amount of bonus withheld is anywhere near the $70,000 he was required to deposit. As noted in the text, the amount of the withholding is less important than the conditions for its return.

gree of care, skill and judgment." In essence, if plaintiff performed the duties of his job reasonably well, he was not at risk. Defendant's insurance would cover catastrophic losses of inventory to which only defendant held title.[14] Although it is somewhat troubling that the evaluation of plaintiff's performance is left to the discretion of the company, the contract sets forward a standard of care that affords protection against arbitrary and capricious decisions by the company. That plaintiff received the return of his security deposit in spite of defendant's dissatisfaction with his performance is an indication that the standard does afford a reasonable degree of protection. It is unclear from the proposed findings of fact how significant a dispute remains between the parties about the amount of the returned deposit. However, as plaintiff has not raised this dispute as a major issue in his motion, I will assume that the amount is relatively insignificant.

In short, plaintiff's contract affords him a means of terminating his agreement with defendant, without significant risk to his investment if business is not going well. His contribution to fixtures and inventory is not subject to loss occasioned by accidents or the vagaries of business world. In this sense, it is not an investment of the type contemplated by the Wisconsin Fair Dealership Law.

I am less persuaded by defendant's argument that plaintiff's compensation did not give him a community of interest with defendant because it was not a straightforward sharing of the profits of the business. Defendant attempts to minimize the degree to which plaintiff's fortunes were tied to the success of the business by arguing that plaintiff was not simply given a share of gross profits with which to pay the store's expenses at his discretion. The fact of the matter was that plaintiff's compensation was tied to the success of the store by a formula under which certain expenses were deducted from gross profit (affecting plaintiff's and defendant's profit shares equally) and others were deducted from adjusted profit (affecting only plaintiff). Defendant attempts to gloss over this distinction by arguing that it paid all the expenses and allocated them against the company in determining plaintiff's share of the profits. In fact, plaintiff bore full responsibility for the variable expenses of the store, even if by the company's accounting practices the payment did not come from his own pocket. In certain months plaintiff received no compensation at all, while in other months he actually owed the company money because the variable expenses of the store exceeded its adjusted profit.

Among the variable expenses for which plaintiff was responsible was the cost of returned checks. Defendant argues that although the cost of unpaid checks was allocated against plaintiff's store, plaintiff did not assume the risk of nonpayment because he performed only routine credit checks and had no authority to extend credit. In support of this argument, defendant cites *Wilburn v. Jack Cartwright*, 543 F.Supp. at 178. In spite of the fact that Wilburn received no commission on a sale that was not properly paid by a customer (a fact cited by the district court in support of its finding that Wilburn was a dealer), the court of appeals ultimately found that he was not a dealer. However, Wilburn's share of the risk of loss of nonpayment was not the reason for the court's conclusion that he was not a dealer. In the instant case, plaintiff assumed the risk of nonpayment, not merely the loss of a commission. Furthermore, plaintiff's contract with defendant made him responsible for approving the credit extended by the store, albeit subject to the company's approval, and jointly responsible for the collection of money due on charge accounts.

---

**14.** Neither the contract nor the parties' proposed findings of fact describe the extent of defendant's insurance or what would happen in the event of a loss of inventory. However, the contract limits the circumstances under which defendant can withdraw from plaintiff's security deposit for losses that are the result of plaintiff's wilful act or gross mismanagement. I read this language to indicate that plaintiff assumed no risk for catastrophic events beyond his control.

As plaintiff notes, defendant's special manager incentive agreement is an example of clever drafting by a corporate legal department. Certain aspects of the agreement, such as the labels "employer" and "employee," the reservation of title to goods and inventory, and the accounting practices for the expenses of individual stores, are insufficient in and of themselves to insulate the company from liability under the Wisconsin Fair Dealership Law. However, another feature of the agreement removes it from the coverage of the act: the refundable security deposit advanced for fixtures and inventory. Because this payment, while substantial, is not at risk, I conclude that it is not the kind of investment the fair dealership law was designed to protect. In reaching this conclusion, I do not intend to suggest that every contribution to fixtures and inventory that takes the form of a security deposit will remove a business arrangement from the scope of the fair dealership law. A contractual provision imposing unreasonable conditions on the refunding of such a deposit or one that failed to provide substantial assurance of refund would likely fall within the protection of the act. My holding is limited to the particular facts of this case.

Because I have determined that plaintiff was not a dealer under the act, it is unnecessary to consider whether he was terminated with good cause and adequate notice.

IT IS ORDERED that defendant's motion for partial summary judgment is GRANTED and that plaintiff's motion for partial summary judgment is DENIED.